DANIEL SANTOR, PLAINTIFF-APPELLANT, v. A & M KARA-
GHEUSIAN, INC., A DELAWARE CORPORATION AND
SEABOARD FLOOR COVERING, INC., A DELAWARE
CORPORATION, JOINTLY, SEVERALLY OR IN THE
ALTERNATIVE, DEFENDANTS-RESPONDENTS.

Argued November 2, 1964—Decided February 17, 1965.

54

*Mr. Joseph A. Maressa* argued the cause for appellant (*Mr. C. Zachary Seltzer,* on the brief).

*Mr. Sheldon Schachter* argued the cause for respondents (*Messrs. Kleinberg, Moroney & Masterson,* attorneys).

The opinion of the court was delivered by

FRANCIS, J. Plaintiff was awarded a judgment of $1,512 representing the cost of certain carpeting he purchased from a retailer of the manufacturer, defendant A & M Karagheusian, Inc. The carpeting was sold as Grade No. 1 and turned out to be defective. The judgment was entered also against defendant Seaboard Floor Covering, Inc., the distributor and wholly-owned subsidiary of Karagheusian which sold the carpeting to the retailer from whom plaintiff bought it. (The matter was treated at the trial level and in the Appellate Division as if a decision as to the manufacturer's liability would be determinative of the case. No separate consideration was asked or given to the distributor. The same is true in this Court. Consequently we shall proceed on the assumption that the judgment below will stand or fall on our view of Karagheusian's liability.) The Appellate Division reversed plaintiff's recovery. 82 *N. J. Super.* 319 (*App. Div.* 1964). We granted plaintiff's petition for certification. 42 *N. J.* 288 (1964).

Defendant Karagheusian manufactures a type of carpeting which it designates and advertises on a nationwide scale as "Gulistan." Plaintiff Santor was aware of the advertising.

On September 6, 1957 Santor purchased for his home 96–2/3 square yards of Gulistan carpeting from A. P. Davis Company, Inc. of Oaklyn, New Jersey, a retailer of Karagheusian. The price was $14 per square yard plus a laying charge of $1.75 per linear yard. The style and pattern had been selected at the showroom of the distributor Seaboard. It was laid around January 1958 and almost immediately plaintiff noticed an unusual line in it. He telephoned the dealer who advised him it would wear away. Some weeks later the dealer examined the carpeting and expressed the view that the line would "walk out" as the pile subsided, and he counseled patience. That reassurance was repeated on a number of occasions. Then, instead of improving when the pile wore down, it became worse and two additional lines appeared.

About eight months after delivery plaintiff decided to "really have it out" with the dealer. But when he drove to the place he found a sign in the window saying "Out of Business." Plaintiff then felt his situation was hopeless and nothing could be done. Later he decided to try to locate the dealer. Some information came to light indicating the dealer had moved to Maine. Correspondence produced no result. Finally contact was made by telephone sometime in 1960 and the dealer assured the plaintiff the carpeting was not second but first grade quality. Santor said it took him that long to locate the dealer. Thereafter he endeavored to ascertain the name and location of the manufacturer. Although the nature of the search and the dispatch with which it was made are not described in any detail, Santor wrote to Karagheusian in September 1960 complaining about the carpeting and requesting that a mill representative be sent to examine it. Such an examination took place and apparently the parties had conversations about the situation for some time thereafter. The record indicates that on December 8, 1960 the dealer wrote Santor giving him full information identifying the type car-

peting he had purchased, specifying that it was No. 1 grade, and giving the dates of the Seaboard invoices. The dealer also expressed the hope Santor would have "no further trouble" in obtaining a satisfactory adjustment. The adjustment was not made and suit was instituted sometime in November 1961. The filing date of the complaint does not appear in the appendix as required by *R. R.* 1:7–1(f).

The original complaint simply alleged the carpeting was defective and sought recovery of its cost. Later an additional paragraph was added charging defendant Karagheusian with breach of an implied warranty of merchantability. At the trial Karagheusian conceded the carpeting had been manufactured defectively. The court decided there was an implied warranty of merchantability from the manufacturer to the purchaser Santor even though there was no privity of contract between them. On the basis of the admission of defective manufacture, the court found a breach of the warranty and entered judgment for the plaintiff for the full purchase price.

I.

In the trial court defendant manufacturer contended that plaintiff, not being a privy to the contract between it and the dealer (or distributor) for the sale of the carpeting, could not recover for the breach of it. A distinction was sought to be drawn between the present situation and that before this Court in *Henningsen v. Bloomfield Motors, Inc.*, 32 *N. J.* 358 (1960). More specifically, *Henningsen* was said to have adopted the rule that where commodities advertised by the manufacturer for the purpose of promoting their sale to the public are such that if defectively manufactured they will be dangerous to life or limb, society's interests can be protected only by eliminating the requirement of privity between the maker and the reasonably expected ultimate consumer when such a consumer suffers bodily injuries as the result of defective manufacture thereof. And, the argument continued, the privity rule was abrogated only in such cases, not for situa-

tions where defective manufacture of the article would not be likely to render it dangerous to the user or did not cause personal injury to him. Thus, said Karagheusian, where defective manufacture results only in a valueless article or in its reduced value, the long-standing requirement for privity of contract between buyer and seller persists, and the buyer's remedy is solely against his seller; there can be no recovery for total or partial loss of value against the manufacturer. The trial court rejected the contention. The Appellate Division accepted it, saying:

"It is clear to us that as of this writing, absent personal injury or damage to health consequent upon use of the product in question, there is no action in this State on the part of a purchaser of goods for breach of warranty in respect of their quality or fitness for use except as against the party from whom he has purchased them." 82 *N. J. Super.*, at *p.* 322.

It is true that most of the discussion in *Henningsen* centers about the right to recover damages for personal injuries suffered by a person not a party to the contract of sale between the purchaser on the one hand and the dealer or the manufacturer on the other. And it was held that, regardless of privity, the injured person, *i. e.,* the purchaser's wife, could recover against the manufacturer and dealer for breach of an implied warranty of merchantability, which by operation of law became an incident of the sale of the automobile to her husband. But plaintiff says defendants overlook that the suit included a claim by Claus Henningsen against Chrysler Corporation for damage to his car in the mishap which resulted in his wife's injuries. Recovery for such damage was allowed against both dealer and Chrysler Corporation. With respect to the manufacturer, the controlling principle was said to be that when a manufacturer puts a new automobile in the stream of trade and promotes its purchase by the public, an implied warranty that it is reasonably suitable for use as such accompanies it into the hands of the ultimate purchaser from the dealer. 32 *N. J.,* at *p.* 384.

In fairness it must be said, however, that no particular emphasis was placed upon the property damage aspect of the case. No effort was made to distinguish between the manufacturer's liability for personal injuries resulting from the defective automobile and damage sustained by the vehicle itself in an accident caused by its defective manufacture. In fact, no argument was made that if the law recognized the existence of an implied warranty between maker and ultimate purchaser, redress for breach thereof should be limited to situations involving personal injuries to such person. And it cannot be said that serious consideration was given to whether a distinction should be made between personal injury claims and loss of bargain claims, i. e., where the breach of the warranty produced total or partial destruction or diminution in value of the article sold.

There is no doubt that the great mass of warranty cases imposing liability on the manufacturer regardless of lack of privity were concerned with personal injuries to the ultimate consumer. See *Henningsen, supra* (32 *N. J.,* at *pp.* 372, 379–384); *Goldberg v. Kollsman Instrument Corporation,* 12 *N. Y. 2d* 432, 240 *N. Y. S. 2d* 592, 191 *N. E. 2d* 81 (*Ct. App.* 1963); *Greenman v. Yuba Power Products, Inc.,* 59 *Cal. 2d* 57, 27 *Cal. Rptr.* 697, 377 *P. 2d* 897 (*Sup. Ct.* 1962); Jaeger, "Privity of Warranty: Has the Tocsin Sounded?," 1 *Duquesne L. Rev.* 1 (1963); Jaeger, "Warranties of Merchantability and Fitness for Use: Recent Developments," 16 *Rutgers L. Rev.* 493 (1962); Prosser, "The Assault Upon the Citadel (Strict Liability to the Consumer)," 69 *Yale L. J.* 1099 (1960). But we see no just cause for recognition of the existence of an implied warranty of merchantability and a right to recovery for breach thereof regardless of lack of privity of the claimant in the one case and the exclusion of recovery in the other simply because loss of value of the article sold is the only damage resulting from the breach.

The manufacturer is the father of the transaction. He makes the article and puts it in the channels of trade for sale to the public. No one questions the justice of a rule which

holds him liable for defects arising out of the design or manufacture, or other causes while the product is under his control. After completion the article may pass through a series of hands, such as distributor and wholesaler, before reaching the dealer at the point of ultimate intended sale. The dealer is simply a way station, a conduit on its trip from manufacturer to consumer. For these reasons in the recent past the courts of many jurisdictions, in an endeavor to achieve justice for the ultimate consumer, have imposed an implied warranty of reasonable fitness on the person responsible for the existence of the article and the origin of the marketing process. From the standpoint of principle, we perceive no sound reason why the implication of reasonable fitness should be attached to the transaction and be actionable against the manufacturer where the defectively-made product has caused personal injury, and not actionable when inadequate manufacture has put a worthless article in the hands of an innocent purchaser who has paid the required price for it. In such situations considerations of justice require a court to interest itself in originating causes and to apply the principle of implied warranty on that basis, rather than to test its application by whether personal injury or simply loss of bargain resulted from the breach of the warranty. True, the rule of implied warranty had its gestative stirrings because of the greater appeal of the personal injury claim. But, once in existence, the field of operation of the remedy should not be fenced in by such a factor.

It should make no difference that the defect in the product did not or was not likely to cause harm to the purchaser. In *Randy Knitwear, Inc. v. American Cyanamid Company*, 11 *N. Y. 2d* 5, 226 *N. Y. S. 2d* 363, 181 *N. E. 2d* 399 (1962), the Court of Appeals of New York recognized a right of recovery against a manufacturer of chemical resins for damage to the fabrics of the plaintiff, an ultimate purchaser and user of the resins. Neither absence of privity of contract nor the fact that only a property damage claim was involved stood in the way of existence of a cause of action. The resins were

made by defendant to prevent shrinkage of fabrics and were represented to textile manufacturers and processers as usable for that purpose. The court said that since "the basis of liability turns not upon the character of the product [*i. e.,* whether, if defective, it is likely to cause personal injury] but upon the representation, there is no justification for a distinction on the basis of the type of injury suffered or the type of article or goods involved." (Brackets ours) 226 *N. Y. S. 2d,* at *p.* 370, 181 *N. E. 2d,* at *p.* 404.

Courts of other states have reached like results. For example, in *Continental Copper & Steel Indus., Inc. v. E. C. "Red" Cornelius, Inc.,* 104 *So. 2d* 40 (*Fla. D. Ct. App.* 1958), absence of privity of contract was disregarded and a purchaser of electrical cable from a dealer was granted damages against the manufacturer of the cable on the theory of breach of an implied warranty of reasonable fitness. The cable was defective and had to be replaced. See, also, the similar Florida case of *Hoskins v. Jackson Grain Co.,* 63 *So. 2d* 514 (*Fla.* 1953). In *Hoskins,* the Florida Supreme Court stated that it had become "aligned with those courts holding that suit may be brought against the manufacturer notwithstanding want of privity." 63 *So. 2d,* at *p.* 515. The Iowa Supreme Court sanctioned a right of recovery against the Ford Motor Company by a purchaser from a dealer on the theory of breach of implied warranty where the new but defective automobile burst into flames and was destroyed. *State Farm Mut. Auto. Ins. Co. v. Anderson-Weber, Inc.,* 252 *Iowa* 1289, 110 *N. W. 2d* 449 (1961); 8 *Williston, Contracts,* § 995A, *p.* 677 (*3d ed.* 1964). In Tennessee the same course was taken. The brakes locked on a new automobile and a verdict against General Motors for the resulting property damage was upheld. *General Motors Corp. v. Dodson,* 47 *Tenn. App.* 438, 338 *S. W. 2d* 655 (*Ct. App.* 1960). See, also, *Jarnot v. Ford Motor Company,* 191 *Pa. Super.* 422, 156 *A. 2d* 568 (*Super. Ct.* 1959); *Picker X-ray Corp. v. General Motors Corp.,* 185 *A. 2d* 919 (*D. C. Munic. Ct. App.* 1962). In our judgment the results of these cases represent sound application of the

law. And we approve Dean Prosser's comment that there is no sensible reason for distinguishing in such cases between personal injury and property damage claims. Prosser, *supra* (69 *Yale L. J., at p.* 1143).

It has been suggested that the public urgency for the rule permitting the manufacturer to be sued by an injured consumer regardless of privity of contract does not exist where the only damage sustained by him is loss of the defective article. The argument is that liability for the latter damage should be restricted to the immediate seller, and that the age-old privity doctrine should continue to bar direct recourse to the manufacturer. And it is said the dealer always has his action over against the maker of the defective product. In *Randy Knitwear, supra,* Judge Fuld dealt with the same problem. He said:

"It is true that in many cases the manufacturer will ultimately be held accountable for the falsity of his representations, but only after an unduly wasteful process of litigation. Thus, if the consumer or ultimate business user sues and recovers, for breach of warranty, from his immediate seller and if the latter, in turn, sues and recovers against his supplier in recoupment of his damages and costs, eventually, after several separate actions by those in the chain of distribution, the manufacturer may finally be obliged 'to shoulder the responsibility which should have been his in the first instance.' (Hamon v. Digliani, 148 Conn. 710, 717, 174 A. 2d 294, 297; see Kasler & Cohen v. Slavouski [1928], 1 K.B. 78, where there was a series of 5 recoveries, the manufacturer ultimately paying the consumer's damages, plus a much larger sum covering the costs of the entire litigation.) As is manifest, and as Dean Prosser observes, this circuity of action is 'an expensive, time consuming and wasteful process, and it may be interrupted by insolvency, lack of jurisdiction, disclaimers, or the statute of limitations.' (Prosser, The Assault upon the Citadel [Strict Liability to the Consumer], 69 Yale L. J. 1099, 1124.)" 226 *N. Y. S. 2d,* at *p.* 368, 181 *N. E. 2d,* at *p.* 403.

We agree pursuit of this wasteful and frequently inadequate process should not be required in New Jersey. No better illustration of its frustrating character can be given than the present case. Plaintiff's immediate seller went out of business and could not be sued here. He was found in Maine where suit

would be burdensome and payment of any judgment speculative.

Accordingly, we hold that plaintiff, as ultimate purchaser of the defective carpeting, may maintain his action directly against the defendant manufacturer, Karagheusian, for breach of its implied warranty of reasonable fitness. We hold, also, that privity of contract between them is not necessary and that such action may be prosecuted even though plaintiff's damage is limited to loss of value of the carpeting.

## II.

The trial court based its judgment for the plaintiff on the theory of breach of implied warranty of merchantability and a holding that in such situation absence of privity of contract between the parties was of no legal consequence. As has been indicated, that thesis finds complete support in *Henningsen*. It seems important to observe, however, that the manufacturer's liability may be cast in simpler form.

As was noted in *Henningsen*, in seeking justice for ultimate consumers the courts were hard put to find legal mechanisms to overcome the strictures of the long-standing privity of contract requirement. Some predicated liability of the manufacturer to ultimate purchaser or consumer on the theory of breach of a warranty that ran with the article like a covenant running with the land; some recognized a third party beneficiary thesis; others said public policy required recognition of a warranty made directly to the consumer; still others spoke of the manufacturer's advertising as creating an express warranty to the consumer. 32 *N. J.*, at *pp.* 378–384; Jaeger, *supra* (1 *Duquesne L. Rev.* 1 *passim*); Prosser, *supra* (69 *Yale L. J.*, at *pp.* 1124–34). We chose at that time to measure the manufacturer's responsibility under modern marketing conditions by an implied warranty of reasonable suitability of the article manufactured for the use for which it was reasonably intended to be sold. *Henningsen*, *supra* (32 *N. J.*, at *p.* 384). Some writers find "constructive"

warranty a more descriptive term. Jaeger, "Product Liability: The Constructive Warranty," 39 *Notre Dame Law.* 501 (1964).

It must be said that in the present-day marketing milieu, treatment of the manufacturer's liability to ultimate purchasers or consumers in terms of implied warranty is simply using a convenient legal device or formalism to accomplish the purpose. It has been suggested, however, that conceptually such a doctrine is somewhat illusory because traditionally warranty has had its source in contract. Prosser, *supra* (69 *Yale L. J.,* at *pp.* 1127–1134). Ordinarily there is no contract in a real sense between a manufacturer and an expected ultimate consumer of his product. The fact is that as a matter of public policy the law has imposed on manufacturers a duty to such persons irrespective of contract or a privity relationship between them. Such concept expressed in terms of breach of implied warranty of fitness or merchantability bespeaks a *sui generis* cause of action. Its character is hybrid, having its commencement in contract and its termination in tort. See *Prosser, Law of Torts* (3d ed. 1964), *pp.* 648, 651; Kessler, "The Protection of the Consumer Under Modern Sales Law, Part 1," 74 *Yale L. J.* 262, 278 (1964).

In this developing field of the law, courts have necessarily been proceeding step by step in their search for a stable principle which can stand on its own base as a permanent part of the substantive law. The quest has found sound expression, we believe, in the doctrine of strict liability in tort. Such doctrine stems from the reality of the relationship between manufacturers of products and the consuming public to whom the products are offered for sale. As we indicated in *Henningsen,* the great mass of the purchasing public has neither adequate knowledge nor sufficient opportunity to determine if articles bought or used are defective. Obviously they must rely upon the skill, care and reputation of the maker. 32 *N. J.,* at *p.* 384. It must be said, therefore, that when the manufacturer presents his goods to the public for sale he accompanies them with a representation that they are

suitable and safe for the intended use. As the Supreme Court of California said, such representation must be regarded as implicit in their presence on the market. *Greenman v. Yuba Power Products, Inc., supra* (27 *Cal. Rptr.,* at *p.* 701, 377 *P. 2d,* at *p.* 901). The obligation of the manufacturer thus becomes what in justice it ought to be—an enterprise liability, and one which should not depend upon the intricacies of the law of sales. The purpose of such liability is to insure that the cost of injuries or damage, either to the goods sold or to other property, resulting from defective products, is borne by the makers of the products who put them in the channels of trade, rather than by the injured or damaged persons who ordinarily are powerless to protect themselves. *Cf. id.* (27 *Cal. Rptr.,* at *p.* 701, 377 *P. 2d,* at *p.* 901). "Sales warranties," said the court, "serve this purpose fitfully at best." *Prosser, Law of Torts, supra,* at *p.* 674.

■ This strict liability in tort is not conditioned upon advertising to promote sales. It arises from mere presence of the product on the market. In expressing this view, Chief Justice Traynor wrote in *Yuba*:

"Under these circumstances [presence on the market], it should not be controlling whether plaintiff selected the machine because of the statements in the brochure, or because of the machine's own appearance of excellence that belied the defect lurking beneath the surface, or because he merely assumed that it would safely do the jobs it was built to do. It should not be controlling whether the details of the sales from manufacturer to retailer and from retailer to plaintiff's wife were such that one or more of the implied warranties of the sales act arose." (Insertion ours) *Id.,* 27 *Cal. Rptr.,* at *p.* 701, 377 *P. 2d,* at *p.* 901.

In *Goldberg v. Kollsman Instrument Corporation, supra,* the New York Court of Appeals sanctioned a cause of action for breach of an implied warranty of fitness in favor of a passenger against the manufacturer of an airplane which crashed. It said that breach of the warranty was not only a violation of the sales contract out of which it arose, but was "a tortious wrong suable by a noncontracting party whose use of the war-

ranted article is within the reasonable contemplation of the vendor or manufacturer." 240 *N. Y. S. 2d,* at *p.* 594, 191 *N. E. 2d,* at *p.* 82. And, speaking of the *Yuba* case, Chief Judge Desmond remarked that the "strict tort liability" doctrine referred to there was "surely a more accurate phrase" than breach of implied warranty of suitability for use. 240 *N. Y. S. 2d,* at *p.* 595, 191 *N. E. 2d,* at *p.* 83. See, also, Cahn, "Law in the Consumer Perspective," 112 *Pa. L. Rev.* 1, 14 (1963) ; Note, "Strict Products Liability and the Bystander," 64 *Colum. L. Rev.* 916, 933–937 (1964) ; Prosser, *supra* (69 *Yale L. J.,* at *p.* 1112).

█ As we have indicated, the strict liability in tort formulation of the nature of the manufacturer's burden to expected consumers of his product represents a sound solution to an evergrowing problem, and we accept it as applicable in this jurisdiction. And, although the doctrine has been applied principally in connection with personal injuries sustained by expected users from products which are dangerous when defective, we reiterate our agreement with *Randy Knitwear, Inc. v. American Cyanamid Company, supra,* that the responsibility of the maker should be no different where damage to the article sold or to other property of the consumer is involved. And see *Morrow v. Caloric Appliance Corporation, 372 S. W. 2d* 41 *(Mo. Sup. Ct.* 1963). In this era of complex marketing practices and assembly line manufacturing conditions, restrictive notions of privity of contract between manufacturer and consumer must be put aside and the realistic view of strict tort liability adopted. As was done almost 50 years ago in *MacPherson v. Buick Motor Co., 217 N. Y.* 382, 111 *N. E.* 1050, 1053, *L. R. A.* 1916, § 696 *(Ct. App.* 1916), the source of liability must be put "where it ought to be." Its source must be put in the law. *Prosser, Law of Torts, supra,* at *pp.* 680, 681.

█ Under the strict liability in tort doctrine, as in the case of express or implied warranty of fitness or merchantability, proof of the manufacturer's negligence in the making or handling of the article is not required. If the article is de-

fective, *i. e.*, not reasonably fit for the ordinary purposes for which such articles are sold and used, and the defect arose out of the design or manufacture or while the article was in the control of the manufacturer, and it proximately causes injury or damage to the ultimate purchaser or reasonably expected consumer, liability exists. Existence of the defect means violation of the representation implicit in the presence of the article in the stream of trade that it is suitable for the general purposes for which it is sold and for which such goods are generally appropriate. As we have said, this representation is found in the law. If it is not a fact—if the article is defective and the defect is chargeable to the manufacturer, his must be the responsibility for the consequent damage or injury. The liability does not depend on traditional requirements for proof of legal or equitable fraud. Considerations of good faith or innocence of the representation or willfulness of the misrepresentation are immaterial to existence of the cause of action. See 64 *Colum. L. Rev., supra,* at *p.* 936.

 It is not necessary in the context of this case to attempt to define the outer limits of the term "defect." See *Crane v. Sears, Roebuck & Co.,* 218 *Cal. App.* 2d 855, 32 *Cal. Rptr.* 754 (*D. Ct. App.* 1963) ; 1 *Frumer & Friedman, Products Liability,* § 16A[3][c] (1960). Defectiveness of defendant's carpeting is conceded. Suffice it to say the concept is a broad one. The range of its operation must be developed as the problems arise and by courts mindful that the public interest demands consumer protection. And, in this connection, obviously one measure of the nature of the manufacturer's obligation necessarily must be the price at which the manufacturer reasonably contemplated that the article might be sold. 74 *Yale L. J., supra,* at *p.* 278.

### III.

 Defendants contend recovery should be denied because plaintiff failed to give them notice of the defective carpeting and of his election to rescind the contract of sale

within a reasonable time after delivery. As to this, reliance is placed on the Uniform Sale of Goods Law, *R. S.* 46:30–55, 75, which require such notice to the immediate seller. The sections have no application in actions such as this one against the manufacturer, *Greenman v. Yuba Power Products, Inc., supra,* 377 *P. 2d,* at *p.* 900, and, in any event, plaintiff gave prompt notice to his immediate seller. See *Prosser, Law of Torts, supra,* at *pp.* 679–680. Moreover, since defendants concede that the carpeting was defectively manufactured, delayed notice to them has no relevancy, even on the issue of credibility of plaintiff's claim.

## IV.

Karagheusian contends further that the trial court erred in giving plaintiff a recovery for the full cost of the carpeting. The argument recognizes that under the Sales Act, as between the dealer and the plaintiff, if the plaintiff had rescinded promptly after learning of the defect in the carpeting, return of the full purchase price from the dealer was in order. *R. S.* 46:30–75. But, it is urged, such price should not have been allowed where plaintiff continued to use the carpeting down to the time of trial.

It cannot be overlooked that plaintiff notified his dealer promptly upon discovery of the "line" in the carpeting and that he was advised that the condition would disappear with use. We have already detailed the efforts made thereafter to resolve the problem by locating and seeking redress from the manufacturer. No finding was made by the trial court as to whether plaintiff further damaged the already defective carpeting by continuing to use it after he should have realized that it was actually defective. The fact is conceded, however, that plaintiff has used the carpeting since delivery to him, throughout his negotiations with dealer and manufacturer, and so far as the record shows, is still using it.

Under the circumstances, in our view the fair and proper measure of damages should be the difference between the price paid by plaintiff and the actual market value of the

defective carpeting at the time when plaintiff knew or should have known that it was defective, *i. e.,* that the "line" would not "walk out." Defendant offered proof that when it first received plaintiff's complaint about the carpeting, two years and nine months after it was laid, the salvage value was $3 to $4 per square yard. The figure was an estimate, not made by the witness whose testimony was offered, but by some other person associated with the manufacturer. Although the record is not very clear, it does indicate the trial court's feeling that regardless of the sufficiency of defendant's proof of salvage value, plaintiff was entitled to recover the full purchase price. Having in mind the uncertain state of the law with respect to the manufacturer's liability when the case was tried, and the obvious concern of all parties with that aspect of the matter, in our judgment justice requires a remand for reconsideration of the problem of damages.

Accordingly, the judgment of the Appellate Division is reversed. The liability aspect of the judgment of the trial court is affirmed and the cause is remanded for a new trial on the issue of damages. At such retrial both parties may offer competent proof of value of the carpeting at the time when plaintiff knew or should reasonably have known that it was defective.

*For reversal* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN —7.

*For affirmance*—None.