MELANSON COMPANY, Inc., Plaintiff,

v.

HUPP CORPORATION, and Metalweld, Inc., jointly, severally or in the alternative, Defendants.

Civ. No. 619–63.

United States District Court
D. New Jersey.

March 17, 1966.

Walter C. Wright, Jr., Cape May, N. J., for plaintiff.

Samuel P. Orlando, Camden, N. J., for defendant, Hupp Corporation.

Wallace, Douglas, Gerry & Mariano, Camden, N. J., by John F. Gerry, for defendant, Metalweld, Inc.

## OPINION

COHEN, District Judge:

The "Diane and Janet" is a commercial, deep sea fishing vessel plying the Atlantic Ocean off Southern New Jersey, out of Cape May, owned and operated by plaintiff Melanson Company, Inc., a New Jersey corporation. Its marine diesel engine is alleged to have been defectively designed, manufactured, serviced, and repaired through the negligence of defendants and in breach of express and implied warranties of fitness for use, thereby causing damages to plaintiff for which it seeks recovery.

Jurisdiction vests in this Court under 28 U.S.C. § 1332, as amended, by reason of diversity and requisite amount in controversy.

The trial of this case to the Court without a jury consumed five full weeks. The presentation of evidence was complex, voluminous, and, at times, reached digressions which obscured the central and crucial issues. Narrative statement will focus upon what is deemed to be the material circumstances and events surrounding this controversy.

In April of 1957, plaintiff purchased the Hercules marine engine in question from defendant Hupp Corporation (which had been manufactured by its corporate predecessor, Hercules Motors Corporation), through the accommodation of defendant Metalweld, Inc., Hupp's dealer and distributor. The actual sale was consummated through Delaware Bay Shipbuilding Company, which also installed the engine for plaintiff. Defendant Metalweld, in effect, brokered the sale through Delaware Bay Shipbuilding Company in order for plaintiff to gain a shipyard discount. The engine was accompanied by Hercules' basic warranty,

which limited its liability to the replacement or repair of parts found to be defective, if any, within six months of the date of shipment or within ninety days of service, whichever was the shorter period.[1] Defendant Hupp claims that not only did such warranty exclude other express, implied, or statutory warranties, but that in fact no others were made at any time to plaintiff.

After installation of the engine during the months of April and May, 1957, purchased for $8,465.51 and installed for $4,179.51, it remained in the operating vessel until January, 1960. It was during this three year interim that the problem now presented arose.

On or about May 24, 1957, the vessel was given its first test run with the new Hercules engine. The engine attained a speed of 1500 rpms and, at that speed, the fresh water cooling system temperature attained 200 degrees. Incomplete combustion resulted in the emission of black smoke from its smoke stack. A service check by Charles J. Schwanbeck, defendant Metalweld's engineer, revealed the cooling system to be in proper order and function, and that the engine was running free, without any drag back to the propeller joint. He concluded that the propeller was too large, thereby absorbing the full power of the engine thrust before the engine could attain its factory rated maximum speed of 2100 rpms and, consequently, recommended that plaintiff purchase a Columbian 5 blade propeller. Captain Boudreau, principal figure of the plaintiff corporation, rejected this recommendation, preferring to use his old 3 blade propeller which had been used for a larger slow speed diesel engine, an Atlas, on a previous boat. Thereupon, Schwanbeck recommended a reduction in the size of the old Atlas propeller.

After the propeller diameter had been reduced on May 31, 1957 by someone other than defendants, selected by the plaintiff, a second test run was held on

---

1. The manufacturer's express warranty reads as follows:

"Basic Warranty

"HERCULES MOTORS CORPORATION     CANTON, OHIO

"Hercules Motors Corporation is a Member of the Internal Combustion Engine Institute and is pleased to warrant all Hercules products sold by it in accordance with the following Basic Warranty adopted by the Institute May 8, 1947, which is subject to future amendment without notice. This warranty is in lieu of any warranty expressed or implied by law and supersedes any different warranty in customer's purchase orders.

"The Manufacturer warrants each new engine sold by the Manufacturer to be free from defects in material and workmanship for six (6) months from date of shipment, but not to exceed ninety (90) days of service, or such other period of time as may be agreed upon in respect to the application in which the engine is used. The obligation under this Warranty, statutory or otherwise, is limited to the replacement or repair at the Manufacturer's factory or at a point designated by the Manufacturer, of such part as shall appear to the Manufacturer, upon inspection at such point, to have been defective in material or workmanship.

"This Warranty does not obligate the Manufacturer to bear the cost of labor or transportation charges in connection with the replacement or repair of defective parts, nor shall it apply to an engine upon which repairs or alterations have been made unless authorized by the Manufacturer.

"The Manufacturer makes no Warranty in respect to trade accessories, such being subject to the Warranties of their respective Manufacturers.

"The Manufacturer shall in no event be liable for consequential damages or contingent liabilities arising out of the failure of any engine or parts to operate properly.

"No express, implied or statutory Warranty other than herein set forth is made or authorized by the Manufacturer."

June 5th or 6th, 1957, and the engine attained a speed of 1600 rpms before the fresh water cooling system reached 200 degrees and black smoke emitted. Clarence McGirr, Hercules Field Service Engineer for 28 years, told Captain Boudreau on the second test run that the propeller, or wheel, although reduced to a 50 inch diameter with a 36 inch pitch, was still too large to enable the engine to attain rated maximum performance. Boudreau refused to make any further reduction in the size of the propeller. McGirr then advised a cut in the reduction gear ratio to 4½ to 1. This was done.

On a third test run in the latter part of June, 1957, the engine was able to attain a speed of 1925 rpms, over a period of ten minutes running with the throttle wide open, before a temperature rise of 200 degrees and black smoke emission. When the engine speed was dropped back to 1800 rpms, the cooling system temperature dropped to 185 degrees and the black smoke ceased. Following this run, representatives of both defendant companies recommended to Captain Boudreau that the propeller diameter be reduced further, in order to eliminate the propeller overload so that the engine could attain its rated speed of 2100 rpms. However, Captain Boudreau refused to have any further propeller diameter reduction made. There is testimony that he stated, rather colorfully, that he wasn't going to swing a toy propeller on his boat. Metalweld insisted that for proper rated performance the reduction would have to be effected, and directed that the vessel remain at the Delaware Bay Shipbuilding Company until reduction was made. Captain Boudreau refused and had the engine governor set at 1800 rpms, at which speed the cooling system had attained 185 degree on the third test run in June, 1957. The manufacturer's recommended maximum speed for continuous operation as a work boat was 1700 rpms, which could vary depending upon the type of service and load haul. Captain Boudreau had the vessel released and placed in active commercial fishing service.

In November, 1959, approximately two and a half years after engine installation, during which time it had been serviced and repaired by Metalweld as well as others, it broke down. Inspection by plaintiff disclosed that the engine's cylinder liners were 0.0055 to 0.008 inches below the top surface of the engine block which, it contends, resulted in poor sealing with the gasket, by reason of defective design and manufacture causing engine failure with ensuing damages, including loss of profits.

The theories of liability advanced by plaintiff are substantially three: (a) sale by a manufacturer through Metalweld, its distributor, to plaintiff of an engine expressly or impliedly warranted to be merchantable and fit for use as intended, but which engine was in fact defective and not fit for the use represented and intended; (b) that such defective engine was placed in the stream of trade by the manufacturer which led to its purchase by plaintiff in reliance upon its national promotional advertising expressly and impliedly warranting fitness for use, hence imposing strict tort liability upon the manufacturer; and (c) negligence in the design, manufacture or servicing of the engine, or a combination of these factors, which rendered the engine inherently dangerous.

Specifically and succinctly, it is the factual contention of plaintiff that the overheating of the engine at certain speeds caused its alleged damages; that such overheating resulted from defectively designed and manufactured cylinder sleeves, which were below the surface of the engine block, thus preventing proper gasket sealing, thereby permitting water from the cooling system to seep into the cylinder housing, causing engine damage.

Defendant Hupp contends that as a matter of marine engineering, the top of the cylinder liners, or sleeves, need not touch the bottom of the gasket in order to obtain effective cylinder seal in

this type engine. Therefore, if the meeting of these two engine parts is not essential to the formation of a proper seal, then the fact that the counterbore pocket may have been ground too deeply into the engine block with the cylinder liner slightly below the surface of the block, such was not a defect in design and/or manufacture.

Defendant Metalweld denies any negligence or breach of implied warranty of reasonable care and fitness in its servicing of the engine. It contends that the overheating and smoke situation was reported to the manufacturer immediately after the first trial run, and that proper recommendations to eliminate such overheating were made to plaintiff and ignored.

Both defendants insist that neither the design, manufacture, nor servicing of the engine, or any combination of those factors, was the proximate cause of the losses alleged by plaintiff. Rather, assert the defendants, plaintiff's damages, if any, were the proximate result of propeller overload, coupled with improper maintenance and abuse of the engine over a three year period of heavy duty commercial fishing, during which time plaintiff was not heard to complain of other than such engine difficulties as are customarily encountered in the trade.

■ Under the theories of plaintiff's case, relying on R.S. 46:30–21(1), N.J. S.A., implied warranty of reasonable fitness for purpose; or R.S. 46:30–21(2), N.J.S.A., implied warranty of merchantable quality; and negligence together with "strict tort liability," under Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1 (1960), and Santor v. A. and M. Karagheusian, Inc., 44 N.J. 52, 207 A.2d 305 (1965), the standard imposed by law in New Jersey [2] for proof of liability is twofold:

(a) proof that a defect did in fact exist in the design and/or manufacture of the engine, and

(b) proof that such defect in design and/or manufacture of the engine did in fact proximately cause damage to the ultimate purchaser.

A brief review of pertinent testimony will be assayed to ascertain whether plaintiff met the burden of proof so imposed. Captain Boudreau's actual knowledge of fishing conditions and performance of this vessel at sea was most limited. The plaintiff's captains and engineers admit to experience only with slow speed diesel engines. None of them were familiar with a Hercules high speed diesel engine. These witnesses believed the fresh water cooling system of the engine reached overheating around 180° to 190°. William F. Ashburn, an engineer on plaintiff's boat from June, 1957 to February, 1958, testified that the engine in question was the first high speed one he experienced. Further, he admitted that he never saw, let alone read, the manufacturer's marine engine manual in the plaintiff's possession on the boat, containing instructions for the proper use, care and maintenance of said engine during the entire time he was engineer of the "Diane and Janet." All of plaintiff's captains and engineers were unaware that the cooling system was equipped with a pressure cap which raised the boiling point of the water to 233° by permitting the escape of water as it expanded from high temperature rises. Captain Irving Loper, in command of plaintiff's boat from June to December, 1957, testified the water cooling system temperature averaged between 170°–175° under normal conditions and that it may have reached 190° during brief periods of time when he used extra power for maneuvering. But he never observed any steam or boiling over of the system. He stated also that neither he nor Captain Boudreau or Ashburn, in his presence, complained to defendant Metalweld's representative, Schwanbeck. He agreed that it was a fair statement of fact that the engine operated in a satisfactory manner.[3] And that he thought

***

2. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

3. "I would say so far as operating normally, like I said before, I didn't have any

the emisson of black smoke during the test runs was caused by a propeller overload of the engine. Additionally, George Lashley, a crewman and cook, who served on plaintiff's boat from December, 1957 to April, 1959 testified that during his hitch there were only six engine breakdowns from overheating, approximately, but these were remedied by slowing the boat down for an hour and a half. He also described a trip in January, 1958 during which water seeped out from beneath the pressure cap. After the engine cooled down, Captain Boudreau added water to the cooling system to replace that which had boiled off. This water discharge showed the system to be operating as designed. It was improper to add water under the circumstances, as the system provided for the discharge of water due to expansion. James A. Riddle, Jr., who made trips during 1958 and 1959 as a deckhand, testified to the vessel's engine heating up at 1300 rpms, a speed of approximately 9½ knots, to 185°–190°, but that other than slowing down for cooling the engine, nothing other than routine difficulties at sea were encountered.

Captain Dunbrocco, who "skippered" the vessel for the greatest period of time with the Hercules engine performing was not produced as a witness by plaintiff, nor was his absence explained. However, for the purposes of the present disposition, no significance shall be attached to this element.

Plaintiff also produced, as witnesses, persons who had worked on the engine or its cooling or fuel system for which servicing repairs it seeks to recover. These included Viggo Hilland, Howard S. Holland and Charles Schwanbeck. However, none of these witnesses related their work to, nor necessitated by, the depth of the cylinder liners or to any defect in the engine. On the contrary, they testified that such repairs as made were reasonably anticipated as routine

servicing incident to normal use and wear of the engine. Schwanbeck, of Metalweld, testified that on one occasion, when he was making water pump repairs, he found the pump shaft and rear bearing scorched and ground from lack of lubrication and discovered the oil cup for these parts empty; he then cautioned Captain Boudreau that an oil inspection check was essential every 6 hours. There is no evidence that after various repairs and adjustments were made as a result of the shakedown test runs that any black smoke was emitted, or that other than routine repair and maintenance problems were encountered.

William Ashburn, plaintiff's engineer, testified that together with Schwanbeck, he removed the engine heads in April, 1958, at which time he found no rust, corrosion or pitting on either the heads or block. In fact, he couldn't find anything wrong whatsoever. A year later, April 1959, plaintiff engaged Howard S. Holland, an independent marine mechanic, who testified that upon removal of the engine heads he observed that they contained some corrosion and pitting, as well as slight warping. The warping he attriuted to excessive heat which could be produced when the engine was subjected to a strain or overload. Rather significantly, he stated warping after 20 months of engine operation was not unusual, for if the engine were subjected to a strain or overload shortly after installation, warping could occur. Holland also found some water in the cylinders at that time which he concluded seeped in as a result of imperfect gasket sealing due to the warping. The corrosion and pitting, he observed, were confined to the warped heads above the gasket and not on the block or cylinders. After having the corrosion and pitting removed from the heads by planing, Holland and Ashburn installed new copper gaskets and reinstalled the heads. The previous year, Ashburn had reinstalled the original gaskets which he did not find in any way

---

problem with the engine whatsoever after we got it operating, outside of the little problem we had with the water and fuel

lines, one time with the fuel pump, I would say that engine operated normally." (Notes of test. p. 203)

defective. Holland admitted that improper installation of the gaskets could result in imperfect sealing permitting water to seep into the cylinders. Obviously, the job done by Ashburn a year earlier had been competent, as no water damage appeared in the engine in April 1959. There was only the minimal pitting after two years of heavy commercial usage, characterized by Holland as a not uncommon incident after a period of such use. He could not say that overheating was caused by the liners being below the block.

The "Diane and Janet" was returned to service in the Spring of 1959 and resumed her heavy duty commercial fishing. With understandable pride, Ashburn stated she would return to port with a full catch, just as fast as any other commercial Fishing boat in the area. But her return to service was shortlived, for her engine was still in November 1959.

The evidence disclosed that during the brief period between April and November 1959 the freshly replaned faces of the engine heads and the unmarked surface of the block had deteriorated so rapidly and to such an extent of damage through pitting and grooving, as to render the engine incapable of further use.

It is inconceivable, in light of the evidence introduced at trial, that this damaged engine resulted from defectively designed or manufactured cylinder liners being sleeved .0055 to .008 of an inch below the engine block. The engine performed for nearly two years without any substantial damage. Plaintiff's own witness, Holland, as an independent marine mechanic, testified that in April, 1959 the engine was perfectly restored and had damage-free heads and block surfaces. Clearly, the cylinder liner depths had remained unchanged throughout nearly two years of operation. And, it is undisputed that neither of the defendants had examined or serviced them since January, 1959—some two and a half months prior to the crucial interval between Spring and Winter of 1959.

Whether the cause of damage which ensued in the eight months after April, 1959 could be attributed to loss of sealing due to improper surfacing of the removed heads, or to improper torqueing, or because of engine operation above recommended continuous load speeds, or by reason of improper maintenance or care, or to an infinite variety of other intervening causes has not been established by the proofs offered by plaintiff.

The conditions which plaintiff alleged were demonstrative of cylinder liner defect in design or manufacture, or both, are shown to be related more plausibly to propeller overload, or inadequate technical knowledge of proper maintenance of this high speed diesel engine. Even plaintiff's own expert, James W. Boakes, conceded a direct relationship between an oversized propeller causing engine overload, which in turn would adversely affect engine performance, as well as cause overheating. It is common practice in determining proper propeller size to open the engine's governor to permit an engine to reach its manufacturer's rated maximum speed. When it fails to attain that rated speed, there is indication of an oversized propeller. This is precisely what was demonstrated during the test runs, when plaintiff insisted upon retaining its old Atlas propeller. And despite recommendations and insistence by defendants upon propeller diminishment, plaintiff fished its boat with evident strain and overload upon its engine for nearly two years, a substantial period of time.

The crux of plaintiff's contention, as advanced by its expert Boakes, who didn't see the engine, or its gaskets, until years later, as contrasted with the defendants' experts who were specialists with the original design and manufacture of this type engine, and the witnesses who were present during performance of the engine, is that in order to form an effective engine sealing the cylinder liner must be in contact with the bottom of the gasket which extends over the cylinder counterbore. And this not having been so, defective design and/or manufacture

caused its damages. But such opinion was grossly inadequate to sustain plaintiff's burden of proof in face of sworn expert testimony to the contrary. Messrs. La Salle and Taggert, Vice Preisdents of Hupp Corporation, pioneer and graduate mechanical engineers, respectively, testified that the Hercules engine in question does not require nor does it depend upon contact between cylinder sleeve and head gasket for effective sealing of the combustion prócess. They explained that this engine is distinctive from most others in that it presents a precombustion or turbulence chamber which adjoins each cylinder bore and introduces a highly atomized mixture of fuel and air into the cylinder bore through a common opening in a position corresponding to the opening in the top of the cylinder liner. These experts stated that this engine is so designed in order to maintain desired levels of compression, despite the passage of combustion gases into this area, as the area is greater than that between depressed liner and head gasket, the latter of which plaintiff complains. The engine was designed according to both La Salle and Taggert, to permit a portion of the head gasket to extend above, but not in flush contact with the top of the cylinder liner, in order to reduce the cubic area in the top of the cylinder and more effectively maintain high combustion ratios in a high speed diesel engine. The analysis by these experts was corroborated by George Colburn, a graduate marine design engineer. He stated liner and gasket contact was not necessary for functionally adequate sealing, and that from his calculation of the cubic area involved between liner and gasket, no material consequence exists in relation to the maintenance of proper combusion ratios. So far as the sealing was concerned, he concluded that the noncompressed half was forced over and below the edge of the cylinder bore, so as to create an even tighter sealing joint than is usually encountered.

■ Because of the complex technical nature of this action, it having been tried to the Court, rather than a jury, the most extreme latitude was afforded to plaintiff in its efforts to meet its required burden of proof of liability and damages. Nevertheless, from a careful assessment of both quantity and quality of the massive testimony adduced, it is the opinion of the Court that plaintiff failed to carry the requisite burden of proof on its allegations against the defendant Hupp of defective design and/or manufacture of the engine, or that the engine was otherwise defective, or that its warranties were breached, from which it might reasonably be deduced that any such proximately caused the damages óf which plaintiff complains.

Likewise, plaintiff has failed to sustain its burden of proof that defendant Metalweld was negligent or breached warranties of skillful, careful and fit servicing, or that it neglected to give timely and appropriate notice of engine defect to defendant Hupp, or that such conduct as it did engage in proximately caused plaintiff's damages. All claims of plaintiff against defendant Metalweld, Inc., based upon alleged acts or omissions, negligence or breach of express or implied warranties regarding its servicing which occurred prior to July 26, 1957, when the vessel was placed into active service with the new engine are barred by operation of law under the Statute of Limitations. R.S. 2A:14–1, N.J.S.A.

Problems of this character, of commercial fishing vessels subject to vicarious exposures of the sea, are not uncommon occurrences. However, an engine manufacturer, or its distributor, is not subject to the arbitrary imposition of liability without proof of failure to meet the prescribed standards of care and manufacturing competence established by law. Although a marine engine is involved, express and implied warranties of fitness for purpose and use are creatures of contract law, not the indulgences of Admiralty. The standards of law and proof in this case are as set forth earlier in this opinion. The necessity for meeting such burden of proof is not only to support just claims, but with equal efficacy to protect those who are without legal fault.

For the foregoing reasons, a judgment of no cause for action shall be entered in favor of both defendants and against plaintiff.

This memorandum shall constitute findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure.

Counsel for defendants shall submit an appropriate judgment in accordance herewith.