**PPG INDUSTRIES, INC., Plaintiff,**

v.

**SUNDSTRAND CORPORATION, Defendant.**

**Civ. A. No. 86–2215.**

United States District Court, W.D. Pennsylvania.

March 7, 1988.

George E. McGrann, Dickie, McCamey & Chilcote, P.C., Pittsburgh, Pa., for plaintiff.

Cloyd R. Mellott, Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION

MENCER, District Judge.

This is a contract and tort action arising out of an contract for engineering design services performed for the plaintiff, PPG Industries, Inc. ["PPG"], by the defendant, Sundstrand Corporation ["Sundstrand"]. The complaint consists of five counts, the first of which is for breach of contract. The second count is for professional negligence, the third for ordinary negligence. Count Four alleges misrepresentation by nondisclosure, and the fifth count is also for misrepresentation. We must now decide upon a motion by Sundstrand for partial summary judgment on all but the contract claim in count one.

### FACTS

PPG, a Pennsylvania corporation with its principal place of business in Pittsburgh, maintains manufacturing facilities throughout the nation. In the mid-seventies, PPG was preparing to solicit quotations and award contracts for the manufacture and supply of new winder and collet systems for the manufacture of fiberglass at its North Carolina facilities. In September, 1976, PPG engineers met with representatives of Task Corporation in Anaheim, California, where Task was located, and Task undertook to develop new designs for winders and collets and to perform analyses of that design. Task later moved its facilities to Fullerton, California, and was acquired by Sundstrand, a Delaware corporation with its principal place of business in Rockford, Illinois. PPG and Sundstrand entered into an "Engineering Services Agreement" in 1977, in which Sundstrand agreed to do analysis and testing work on the stress and fatigue life of the collet fingers to assure that the specified minimum life of 250,000 cycles was attainable. Design review meetings were held on April 19–20, 1977, in Rockford, Illinois, on June 30, 1977 in Shelby, North Carolina, and on October 17–18, 1977 in Denver, Colorado. On October 27, 1977 the results of a preliminary design study on one of the new winder configurations was held in Rockford, Illinois. Another review meeting was held in Anaheim,

California on January 24–25, 1978. Sundstrand did stress and fatigue life analyses of a collet finger, which was an aluminum extrusion machined on both the inside and outside surfaces, and certified that the collet finger, as designed, would last well in excess of 250,000 cycles, the required life specified by PPG. Sundstrand's primary stress analyst was Mari Wolf, who was located at the Anaheim, California office of Sundstrand. She was supervised by Benjamin Gay, also located in California. Mari Wolf spent a considerable portion of 1977 in Rockford, Illinois performing the stress analyses, and apparently drafted Sundstrand's reports to PPG in California. Based on Sundstrand's findings, PPG issued various purchase orders to Sundstrand for the manufacture and supply of winders and collets.

After Sundstrand had begun supplying PPG with new winders, PPG inquired of Sundstrand whether less expensive collet fingers, not machined on the inside surfaces [called "as extruded" collet fingers] would still meet the stress and fatigue life criteria. The parties dispute the genesis of the design revision. PPG claims that Sundstrand informed them that they were going to discontinue machining the inside surfaces and would supply "as extruded" collet fingers. Sundstrand claims PPG ordered it to undertake a "Value Engineering Study" to identify strategies to reduce costs. In either event, Sundstrand advised PPG that eliminating the machining of the inside surface could reduce the cost of the collet fingers by 42 percent. PPG alleges that Sundstrand gave it written assurance that the change would not affect the stress and fatigue life of the collet fingers. PPG states that Sundstrand supplied it with at least 354 winders with "as extruded" collet fingers. PPG's complaint alleges that in May, 1986 it discovered that these "as extruded" collet fingers were developing stress cracks below the specified minimum life. They allege that this rendered the collet fingers unfit for further service, causing PPG extensive engineering costs in its efforts to replace all the "as extruded" collet fingers supplied by Sundstrand.

PPG filed this action alleging a breach of the Engineering Services Agreement, causing damage to the collet fingers themselves as well as the cost of replacement. In addition, PPG's complaint contains causes of action in tort. PPG alleges that Sundstrand breached its duty to perform its design work in a professional and non-negligent manner. PPG also claims that the defendant misrepresented by not disclosing that it had not tested the "as extruded" collet fingers, and by insisting that the "as extruded" collet fingers would meet the design criteria.

Sundstrand's motion for partial summary judgment claims that PPG's remedies for the cost of replacement, an economic loss, are defined exclusively in an action under the contract. Therefore, Sundstrand argues, PPG's tort claims fail to state a cause of action for which relief can be granted. PPG responds that choice of law requires that this Court apply the laws of California, Illinois or North Carolina, and not that of Pennsylvania, and that those states would recognize a tort remedy for this loss where the contract is for professional services.

## DISCUSSION

### A. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if, upon a review of the materials properly before the court, "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). Summary judgment may properly be granted in the face of some alleged factual dispute between the parties, because Rule 56(c) requires only that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). While a court must view the evidence in a light most favorable to the non-moving party, *Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir. 1983), summary judgment must be granted "against a party who fails to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 273 (1986); C. Wright, A. Miller, M. Kane *Federal Practice And Procedure* § 2727 (Supp. 1987).

## B. *Is Economic Loss Recoverable Under Tort Theory?*

Sundstrand's motion for summary judgment is grounded on the proposition that the cost of replacement of the collet fingers is an economic loss, and "when the failure of a product results only in economic loss, the owner's remedy is in contract and not in tort." Memorandum in Support of Defendant's Motion for Partial Summary Judgment, p. 3. Sundstrand's position enjoys considerable support from the United States Supreme Court in *East River Steamship Co. v. Transamerica Delaware, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), and the Third Circuit in *Aloe Coal Co. v. Clark Equipment Co.*, 816 F.2d 110, 117 (3d Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987).

In *East River*, charterers of supertankers brought suit against turbine manufacturers seeking damages from alleged design and manufacturing defects which caused the supertankers to malfunction while on the high seas. 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865. The suit had originally alleged breach of contract and warranty as well as tort claims for strict liability for design defects and negligent supervision of the installation. Due to statute of limitations defenses, the contract claims were dropped and the suit was brought in tort only. 106 S.Ct. at 2297.

The Supreme Court in *East River* had to decide whether injury to a product itself may be brought in tort. Noting that product liability law has expanded to afford greater protection from dangerous products than is available under warranty law, the Court commented that "[i]t is clear, however, that if this development were allowed to progress too far, contract law would drown in a sea of tort." 106 S.Ct. at 2300. Justice Blackmun, writing for a unanimous Court, first examined the prevailing majority and minority views. The majority approach, exemplified by *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965) (defective truck), held that preserving a proper role for the law of warranty precludes imposing tort liability if a defective product causes purely monetary harm. *East River*, 106 S.Ct. at 2301 (*also citing Jones & Laughlin Steel Corp. v. Johns–Manville Sales Corp.*, 626 F.2d 280, 287 and n. 13 (3d Cir.1980). Justice Blackmun then reviewed the minority approach, whose progenitor, *Santor v. A and M Karagheusian, Inc.*, 44 N.J. 52, 66–67, 207 A.2d 305, 312–313 (1965) (marred carpeting), held that a manufacturer's duty to make nondefective products encompassed injury to the product itself, whether or not the defect created an unreasonable risk of harm. *Id.* The Court rejected the minority view, holding that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." *Id.*

Explaining why the Court had arrived at the public policy judgment that there should be no tort remedy for economic loss, Justice Blackmun wrote that repair costs, decreased value and lost profit are "essentially the failure of the purchaser to receive the benefit of its bargain—traditionally the core concern of contract law." *East River*, 106 S.Ct. at 2302. After examining the law's policy concern for spreading costs in products liability cases, Justice Blackmun went on to broader contract law concerns:

Contract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements. The manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies. *See* UCC §§ 2–316, 2–719. In exchange, the purchaser pays less for the product. Since a commercial situation generally does not involve large disparities in bargaining power, *cf. Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69 (1960), we see no

reason to intrude into the parties' allocation of risk.

*Id.,* 106 S.Ct. at 2303.

In *Aloe Coal Co. v. Clark Equipment Co.*, the purchaser of a tractor shovel which was destroyed by a fire of unknown origin brought an action against the manufacturer based on three theories: negligence, strict liability, and breach of warranty. 816 F.2d 110 (3d Cir.1987). The Third Circuit was obliged to apply Pennsylvania law to the case and decided that even though *East River* was an interpretation of federal admiralty law, the United States Supreme Court's analysis was so persuasive that it would be followed by Pennsylvania courts in land-based contract cases. The circuit court concluded that Pennsylvania courts would "reaffirm their lack of hospitality to tort liability for purely economic loss." 816 F.2d at 119.

The Third Circuit's opinion noted that the *East River* decision "focused on the realities of the marketplace and recognized the *quid pro quo* of modern arm's length commercial transactions of the character now before us." *Id.* at 118. It praised the Supreme Court's analysis which "identified, examined, and evaluated controlling dogma, doctrine, and fundamental principles of tort and contract remedies." *Id.* It then quoted from Judge Aldisert's recent reflections on judicial philosophy:

> The time has come to identify exactly what fundamentals underlie the controversy in each case, and to isolate which is the governing branch of the law's family tree. Our first step in any legal argument must be to look at the tree's trunk and main branches, rather than to concentrate on new twigs that continually sprout in all directions.

*Id.* (*quoting* Aldisert, *The House of the Law,* 19 Loy.L.A.L.Rev. 755, 764 (1986). We must do the same in this case.

PPG attempts to distinguish *East River* and *Aloe Coal* on the grounds that this is a contract for professional services, not for manufactured goods. They cite an Illinois intermediate appellate court decision which held that an architect could be liable in tort for economic loss for negligence. *See Ro-sos Litho Supply Corp. v. Hansen,* 123 Ill.App.3d 290, 78 Ill.Dec. 447, 462 N.E.2d 566 (1984); *see also J'Aire Corp. v. Gregory,* 157 Cal.Rptr. 407, 598 P.2d 60 (1979) (contractor can be liable to third party beneficiary of contract for damage to prospective economic advantage). PPG asserts that to find otherwise "would render the body of law regarding malpractice as meaningless." PPG's Brief in Opposition to Defendant's Motion for Partial Summary Judgment, p. 14.

We think it important to follow Judge Aldisert's counsel to "identify exactly what fundamentals underlie the controversy" in this case, and "look at the tree's trunk and main branches, rather than to concentrate on new twigs." While *East River Steamship* was an admiralty case and concerned a manufactured product, we think its examination of the proper role of contract and tort remedies has application in this dry land dispute over an engineering agreement. The Supreme Court was plainly concerned that unless bright line limits were set to check a vast expansion of tort remedies, "contract law would drown in a sea of tort." *East River,* 106 S.Ct. at 2300. We think the facts of this case present compelling circumstances for adhering to the Supreme Court's judgment that economic loss, such as we PPG alleges here, is "essentially the failure of [PPG] to receive the benefit of its bargain—traditionally the core concern of contract law." *Id.,* 106 S.Ct. at 2302.

As for the peril to "the body of law regarding malpractice," we believe the reports of its death are greatly exaggerated. The special non-contractual duties of professionals such as doctors, lawyers and architects enforced by tort law were created in part to make up for the lack of sophistication and bargaining power of those seeking these professional services. The work of such professionals often cannot be precisely defined by contract. That is not the case in this dispute. Both PPG and Sundstrand are highly professional, sophisticated corporations adept at negotiating complex agreements and allocating risks between them. The detail of their prelimi-

nary proposals, correspondence and contract attest to the arm's length nature of the negotiations and transactions and detailed expectations of the work to be performed by Sundstrand. To decline to follow the *East River/Aloe Coal* analysis because the contract at issue involved designing and testing collet fingers rather than manufacturing them would be to disregard the Supreme Court's integral understanding of the distinction between contract and tort remedies.

### C. *Choice of Law*

In diversity cases, the federal court must apply the choice of law principles of the forum state in which its sits. *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Melville v. American Home Assurance Co.,* 584 F.2d 1306, 1308 (3d Cir.1978). Pennsylvania has adopted a flexible conflicts methodology which takes into account both the grouping of contacts with the various concerned jurisdictions and the interests and policies of the concerned jurisdictions. *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964); *Melville, supra.* PPG argues that this Court is obliged to apply either California, Illinois or North Carolina law to this case, since those states have the greatest interest in and contacts with the activities upon which PPG bases its suit.

PPG refers the Court to a number of California and Illinois cases which arguably support its position that economic loss can be recoverable under tort claims arising from professional services contracts. *See J'Aire Corp. v. Gregory,* 24 Cal.3d 799, 157 Cal.Rptr. 407, 598 P.2d 60 (1979) (recognizing a cause of action for negligent interference with prospective economic advantage); *Rosos Litho Supply Corp. v. Hansen,* 123 Ill.App.3d 290, 78 Ill.Dec. 447, 462 N.E.2d 566 (1984); *Bates & Rogers Constr. Corp. v. North Shore Sanitary Dist.,* 92 Ill.App. 3d 90, 414 N.E.2d 1274 (1980) (engineers can be liable under negligence theory). In both California and Illinois, however, there are state supreme court decisions which support the *East River/Aloe Coal* analysis. *See Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965) (discussed with approval in *East River,* 106 S.Ct. at 2301); *Moorman Manufacturing Co. v. National Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982). There seems to be no relevant case law on this point to date in North Carolina. Because neither California, Illinois or North Carolina have adopted a clear position in support of PPG's argument, we find it reasonable to assume that each state would likely adopt the United States Supreme Court's persuasive analysis in *East River.* We believe the choice of law on this question would result in the same conclusion, in line with *East River,* no matter whether California, Illinois or North Carolina or Pennsylvania law were to be applied. We therefore find it unnecessary to decide which of these state's law to apply. We believe that California, Illinois, North Carolina and Pennsylvania courts would all find that PPG cannot recover economic loss under tort theories in this case.

### CONCLUSION

For the reasons set out above, we find that PPG cannot recover its economic losses under the tort claims alleged in Counts 2, 3, 4 and 5. We do not find there to be any *genuine* issues of *material* fact, and further find that PPG has not established the elements of a cause of action in tort. We will therefore grant Sundstrand's Motion for Partial Summary Judgment.