The MEAD CORPORATION, Plaintiff,

v.

ALLENDALE MUTUAL INSURANCE COMPANY et al., Defendants.

No. C75–1035.

United States District Court,
N. D. Ohio, E. D.

Jan. 3, 1979.

dale"), Allmanna Suenska Elektriska Aktiebolaget Inc. (hereinafter "ASEA Inc."), Stal-Laval Turbine AB (hereinafter "Stal-Laval"), and Allmanna Suenska Elektriska Aktiebolaget AB (hereinafter "ASEA AB"). Two of the four defendants are citizens of the United States and two are citizens of Sweden. Allendale was organized under the laws of Rhode Island and has its principal place of business in Rhode Island, and ASEA Inc. was organized under the laws of New York and has its principal place of business in New York. Both Stal-Laval and ASEA AB are Swedish companies with headquarters and principal plant facilities in Sweden.

This action arose in March of 1974 when a generator Mead bought from ASEA Inc. broke down. Jurisdiction is based upon 28 U.S.C. § 1332 (1976) and the. matter is before the court on defendants ASEA Inc., Stal-Laval, and ASEA AB's motions for summary judgment. Fed.R.Civ.P. 56.

Marvin L. Karp, Cleveland, Ohio, for plaintiff.

Lawrence Zelle, Minneapolis, Minn., David Davies, Arter & Hadden, Cleveland, Ohio, for defendant Allendale.

Selvin Seidel, Hale, Russell, Gray, Seaman & Birkett, New York, New York, Daniel W. Hammer, Thompson, Hine & Flory, Cleveland, Ohio, for defendants ASEA and Stal-Laval.

## MEMORANDUM OF OPINION AND ORDER

MANOS, District Judge.

The plaintiff, Mead Corporation (hereinafter "Mead"), was organized under the laws of Ohio and has its principal place of business in Ohio. Mead has brought this action against four defendants, Allendale Mutual Insurance Co. (hereinafter "Allen-

## I. FACTUAL BACKGROUND [1]

Although they are separate legal entities, ASEA Inc., Stal-Laval, and ASEA AB are closely related. ASEA AB is the parent corporation of both ASEA Inc. and Stal-Laval. ASEA AB manufactures the generators that Stal-Laval uses in its manufacture of steam turbines, and ASEA Inc. distributes and services these turbines in the United States.

In 1965 Mead was in need of a steam turbine for its Chillicothe, Ohio facility and it entered into negotiations with ASEA Inc. The negotiations between Mead and ASEA Inc. were long and involved. Mead knew that the turbine it was purchasing would be manufactured by Stal-Laval and that many of the component parts would be manufactured by ASEA AB. In fact, in September of 1965 Mead sent its technicians to Sweden for meetings with officials of both Stal-Laval and ASEA AB.

1. For purposes of the defendants' motion to dismiss, the operative facts of this case are not in dispute. The account set out above is based upon the voluminous exhibits attached to the parties' motions for summary judgment.

Upon conclusion of the sales negotiations Mead agreed to purchase a turbine for $635,681.00. A provision of the contract limited ASEA Inc.'s liability to repair or replacement of defective parts for 12 months from delivery date.[2] The provision made this remedy the exclusive remedy for a breach of warranty and it specifically excluded liability for consequential damages.

The turbine Mead purchased was delivered in late 1966 and was known as the # 12 turbine at Mead's Chillicothe, Ohio facility. The # 12 turbine contained two generators and within each of these generators there was a rotor, which consisted of coils of copper.

In August of 1967 the # 12 turbine suffered an outage (i.e. breakdown). Upon examination, it was determined that the copper coils within the rotors of the generators would have to be completely rewound. Since this outage occurred within the one-year warranty period, ASEA Inc. arranged to have the rotors sent to ASEA AB in Sweden. A Mead technician accompanied the rotors to Sweden and oversaw ASEA AB's repair work.

The method ASEA AB employed to rewind the rotors involved, in part, the use of braying material and "butt joints" to join pieces of the coils together. By November of 1967 the rewound rotors were returned to Mead and the # 12 turbine was in operation. In accordance with the contract,[3] Mead was not charged for the repair of the rotors and Mead did not claim any consequential damages resulting from the outage.

With the exception of a minor outage in 1973 [4] the # 12 turbine operated smoothly until March 25, 1974. On that date the turbine suffered the outage that is the subject of this suit. According to Mead, the March, 1974 outage was caused by the faulty copper coils within the rotors of the generators.

Mead claims that the heavy sulfur concentration around the # 12 turbine caused the corrosion of the phosphorous in the braying material used by ASEA AB in 1967. Mead claims the corrosion weakened the joints in the coils and ultimately caused the joints to separate, which caused the outage. Mead claims further that ASEA AB used too many joints in its 1967 repair of the rotors and that the butt joints used by ASEA AB in 1967 were poorly designed.

Since ASEA Inc.'s contractual warranty had long since lapsed, Mead sent the rotors

2. The provision read as follows:

"15. All machinery and apparatus of our manufacture is guaranteed to have the performance stated in the quotation, to be of high grade material throughout and of good and careful workmanship, in such a manner that we undertake to correct and made good any defect or defects, which may develop under normal and proper use within the guarantee period and which are due solely to faulty design, material, or workmanship; provided always that we are notified immediately the defect is discovered [sic] and that such defective parts are promptly returned to our Works, all charges prepaid. The repaired or new parts will be delivered from our Works. Defective parts thus replaced remain our property. Unless otherwise stated in the quotation or order confirmation, the guarantee period is twelve months for all ordinary machinery and apparatus operated under normal conditions. The guarantee period is reckoned from the date delivery is made, or if delivery cannot be made on account of delays caused by circumstances beyond our control, from the date the goods are ready for dispatch at our Works. All liability on our part ceases at the termination of the guarantee period. Goods delivered by us but not of our own manufacture are covered only by the subcontractor's own guarantee, if any.

"16. Our liability is in all cases limited as provided in these Conditions and does not extend to consequential damages, either direct or indirect, nor to expenses for repairs or replacements or otherwise, paid or incurred without our authority. We accept no liability for defects or depreciation caused by damage in transit, faulty erection, wear and tear, accidents, lightning, dampness, neglect, misuse or other abnormal conditions, due directly or indirectly to circumstances beyond our control."

3. The operable provisions are set out in note 2, *supra.*

4. In 1973 one rotor had to be repaired. Mead paid for this repair work and asserted no claim for damages, consequential or otherwise, against the defendants.

to a Columbus, Ohio firm for repair, and on July 24, 1974 the # 12 turbine was again in operation.

Mead claimed its damages for the 1974 outage totaled $1,760,000.[5] Mead was insured by two companies, Westbury Enterprises Ltd. and Allendale. Westbury determined that its policy covered the damages that were due to the 1974 outage and it paid Mead $500,000. Allendale, however, contended that its policy did not cover the extra $1,260,000 loss that Mead suffered.

In December of 1975 Mead filed this action. In its complaint Mead originally named only Allendale, ASEA Inc., and Stal-Laval. In March of 1977, however, Mead amended its complaint to add ASEA AB as a defendant. Mead is suing Allendale for the amount it claims it has forthcoming under its insurance policy, and it is suing ASEA Inc., Stal-Laval, and ASEA AB for negligence and breach of implied warranties in tort. Allendale, in turn, has cross-claimed against ASEA Inc., Stal-Laval, and ASEA AB alleging that if it is liable to Mead under the insurance policy, then it is subrogated to Mead's claims against ASEA Inc., Stal-Laval, and ASEA AB.

In March of 1978 ASEA Inc., Stal-Laval, and ASEA AB moved for summary judgment on Mead's claims against them. In its response to these defendants' motions for summary judgment, Mead indicated that it stands ready to drop its claims against ASEA Inc. Therefore, the only questions before the court now are whether Stal-Laval and ASEA AB should be granted summary judgment on Mead's negligence and implied warranty in tort claims.

## II. PRELIMINARY ISSUES

### Personal Jurisdiction

■  In a diversity matter a federal court must look to the law of the forum state to determine the extent of its *in personam* jurisdiction. *In-Flight Devices Corp. v. Van Dusen Air, Inc.,* 466 F.2d 220, 224 (6th

Cir. 1972); *Southern Machine Co. v. Mohasco Industries, Inc.,* 401 F.2d 374, 396 n. 2 (6th Cir. 1968). In Ohio the extent of a court's personal jurisdiction over a foreign corporation is determined by reference to Ohio's "long-arm" statute, Ohio Rev.Code Ann. § 2307.382 (Page Supp.1977). Mead asserts that the following subsections of section 2307.382 provide this court with *in personam* jurisdiction over both Stal-Laval and ASEA AB:

(A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:

(1) Transacting any business in this state;

.        .        .

(4) Causing tortious injury in this state by an act or omission outside this state if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state;

(5) Causing injury in this state to any person by breach of warranty expressly or impliedly made in the sale of goods outside this state when he might reasonably have expected such person to use, consume, or be affected by the goods in this state, provided that he also regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state   .   .   ..

If Stal-Laval and ASEA AB come within the purview of any one of the above subsections this court has personal jurisdiction over them. *In-Flight Devices Corp. v. Van Dusen Air, Inc.,* 466 F.2d 220, 224 (6th Cir. 1972).

■  The court holds that the defendants' actions give this court personal jurisdiction under section 2307.382(A)(5). The first requirement of this subsection is that

---

**5.** Mead claimed its direct damage loss was $250,000, and that it suffered $1,510,000 in consequential damages. *See* text accompanying note 12 *infra* for the distinction between direct and indirect economic loss.

the injury occur in Ohio. This requirement has clearly been met. All the injuries Mead alleges occurred at Mead's Chillicothe, Ohio facility. The second requirement is that the injury be caused by a breach of warranty in the sale of goods outside Ohio when the defendant could reasonably expect that the plaintiff would use, consume, or be affected by those goods in Ohio. This requirement has also been fulfilled. Mead has alleged a breach of an implied warranty in tort in connection with the out-of-state [6] sale of a turbine and two generators, and since the defendants were involved in the sales negotiations with Mead they obviously knew Mead would use the machinery in Ohio.[7]

■ The final requirement of section 2307.382(A)(5) is stated in the alternative: the defendants must regularly solicit or do business in Ohio, or engage in any other persistent course of conduct in Ohio, or derive substantial revenue from goods used or services rendered in Ohio. The last of these three alternatives—derivation of substantial revenue from goods used in Ohio— has been fulfilled by the defendants. Through their distributor, ASEA Inc., the defendants have received roughly four to five million dollars worth of revenue from sales of their products in Ohio during the last ten years.[8] "Substantial revenue" is a flexible term and a trial court necessarily has some latitude in determining what constitutes "substantial revenue." *Ross v. Spiegel, Inc.*, 53 Ohio App.2d 297, 373 N.E.2d 1288 (1977). Accordingly, upon examination of the few cases that have interpreted this term,[9] the court holds that the defendants' five million dollars worth of revenue suffice to satisfy the section 2307.-382(A)(5) requirement of "substantial revenue."

The court therefore holds it has personal jurisdiction over defendants Stal-Laval and ASEA AB.

### Statute of Limitations

Mead has alleged that its cause of action arose when the outage occurred in March of 1974. ASEA AB, however, was not made a part of this lawsuit until March of 1977, more than two years after the cause of action arose. ASEA AB maintains therefore that Ohio's statute of limitations, set out below, bars Mead's claims against it:

An action for bodily injury *or injuring personal property* shall be brought within two years after the cause thereof arose.

Ohio Rev.Code Ann. § 2305.10 (Page 1954) (emphasis added).

■ Initially, the court notes that Ohio law will govern whether Mead's claims against ASEA AB are barred by the statute of limitations. *Ragan v. Merchants Transfer & Warehouse Co.*, 337 U.S. 530, 69 S.Ct.

---

**6.** While the three defendants, ASEA Inc., Stal-Laval, and ASEA AB are closely related, ASEA Inc. is the one who sold the turbine to Mead in Ohio. Prior to that, ASEA AB had sold the generators to Stal-Laval, who then manufactured the turbine and, in turn, sold it to ASEA Inc. for distribution in the United States.

**7.** The defendants' negotiations with Mead more than satisfy the second requirement of Ohio Rev. Code Ann. § 2307.382(A)(5) (Page Supp. 1977). This subsection is more frequently employed to obtain personal jurisdiction over large manufacturers who have no face-to-face dealings with the eventual consumer. *E.g. Ross v. Spiegel, Inc.*, 53 Ohio App.2d 297, 302, 373 N.E.2d 1288, 1293 (1977).

**8.** Defendants' Exhibit 12, deposition of John O'Hara. *See also* plaintiff's Exhibit T.

**9.** *Stewart v. Bus and Car Co.*, 293 F.Supp. 577 (N.D.Ohio 1968) (Belgian corporation sold two businesses in Ohio for $90,000; district court held it was "substantial revenue"); *Busch v. Service Plastics, Inc.*, 261 F.Supp. 136 (N.D. Ohio 1966) (Illinois corporation had annual sales in Ohio that ranged between $100,000 and $200,000; district court held it was "substantial revenue"); *Ross v. Spiegel, Inc.*, 53 Ohio App.2d 297, 373 N.E.2d 1288 (1977) (multi-million dollar sales of Hong Kong corporation's goods in the United States coupled with indications that a proportionate share of these goods was sold in Ohio; appellate court held it was "substantial revenue"); *McCormick v. Haley*, 29 Ohio Misc. 97, 279 N.E.2d 642 (C.P.1971) (out-of-state corporation had $160,000 worth of sales in Ohio; trial court held it was "substantial revenue"). *Cf., Miller v. Trans World Airlines, Inc.*, 302 F.Supp. 174 (E.D.Ky.1969) (interpretation of a long-arm statute identical to § 2307.382(A)(5)).

1233, 93 L.Ed. 1520 (1949); *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *Hayden v. Ford Motor Co.*, 497 F.2d 1292 (6th Cir. 1974); *see Witherow v. Firestone Tire & Rubber Co.*, 530 F.2d 160 (3d Cir. 1976). And, as ASEA AB contends, Ohio law does impose a two year limitation period upon negligence and implied warranty in tort claims. Ohio Rev. Code Ann. § 2305.10 (Page 1954); *Mahalsky v. Salem Tool Co.*, 461 F.2d 581 (6th Cir. 1972); *United States Fidelity & Guarantee Co. v. Truck and Concrete Equipment Co.*, 21 Ohio St.2d 244, 257 N.E.2d 380 (1970). Without more, therefore, it would appear that Mead's claims are time-barred.

Mead does not deny, however, that its claims against ASEA AB arose more than two years before it made ASEA AB a defendant in this suit. Mead contends that the two year limitation period contained in section 2305.10 was tolled by the "saving clause" set out in Ohio Rev.Code Ann. § 2305.15 (Page Supp.1975):

> When a cause of action accrues against a person, if he is out of the state, or has absconded, or conceals himself, the period of limitation for the commencement of the action as provided in section . . . [§ 2305.10] . . . does not begin to run until he comes into the state. . . .

Mead argues that ASEA AB has been "out of state" within the meaning of section 2305.15 ever since the cause of action arose in March of 1974, and that the two year limitation period contained in section 2305.-10 has never run in favor of ASEA AB.

**[6]** Because this is a diversity action in which Ohio law controls, this court must look to that state's supreme court for an interpretation of Ohio's "saving clause." *Commissioner v. Estate of Bosch*, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967). A review of Ohio Supreme Court decisions on this statute reveals that a unique construction of this "saving clause" prevails.

■ Under Ohio law, the "saving clause's" tolling of the statute of limitations is tied to a defendant's amenability to *personal* service. *Seely v. Expert, Inc.*, 26 Ohio St.2d 61, 65–66, 269 N.E.2d 121, 128 (1971). If a defendant is not amenable to personal service within the state of Ohio, that defendant is deemed to be "out of state" within the meaning of section 2305.15 and the statute of limitations is prevented from running in his favor. This rule applies even when the defendant is a nonresident of Ohio, and despite the fact that substituted service is available under the Ohio Rules of Civil Procedure. See *Seely v. Expert, Inc.*, 26 Ohio St.2d 61, 65, 269 N.E.2d 121, 129 (1971).

■ In effect, under Ohio law a corporation that is not physically present (or that does not have a statutory agent) in Ohio—and thereby is not amenable to *personal* service—never receives the protection of the two year statute of limitations contained in section 2305.10. *Ohio Brass Co. v. Allied Products Corp.*, 339 F.Supp. 417, 424 (N.D.Ohio 1972); *Seely v. Expert, Inc.*, 26 Ohio St.2d 61, 269 N.E.2d 121, 128 (1971). While the Ohio Supreme Court's construction of section 2305.15 has been criticized,[10]

10. The stance taken by the Ohio Supreme Court puts nonresidents at a severe disadvantage. Because of Ohio's liberal rules allowing substituted service, Ohio R.Civ.P. 4.3, an Ohio resident can obtain service (and, in turn, a judgment *in personam*) over a nonresident any time after a cause of action arises. Yet because a nonresident is beyond the reach of personal service, the Ohio "saving clause" prevents the statute of limitations from running in the nonresident's favor. In effect, an Ohio resident has until *ad infinitem* to bring suit against a nonresident.

Tying the operation of the Ohio "saving clause" to personal service, as the supreme court has done, is even further remarkable given the fact that Ohio has adopted certified mail service as the "basic and preferred method of service." Ohio R.Civ.P. 4.1.

The Ohio Supreme Court has recognized the strength of the argument against its anomalous interpretation of the saving clause, *Seely v. Expert, Inc.*, 26 Ohio St.2d 61, 67, 269 N.E.2d 121, 128 (1971), but has refused to revise its interpretation on the grounds of *stare decisis* and the Ohio legislature's willingness to retain the "saving clause" as it was originally drafted. *Wetzel v. Weyant*, 41 Ohio St.2d 135, 137–38, 323 N.E.2d 711, 712–13 (1975); *Seely v. Expert, Inc.*, 26 Ohio St.2d 61, 67–68, 72, 269 N.E.2d 121, 128–29 (1971).

in a diversity action in which Ohio law controls a federal district court must nonetheless follow the Ohio Supreme Court's interpretations of Ohio statutes. See, e. g., *Commissioner v. Estate of Bosch*, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967).

■ ASEA AB is a foreign corporation. Although its employees have been in Ohio on occasion, ASEA AB has not been amenable to *personal* service in Ohio since Mead's causes of action arose. The court holds therefore that the Ohio "saving clause," section 2305.15, has tolled the two year statute of limitations contained in section 2305.10. Accordingly, Mead's claims against ASEA AB are not time-barred.

### The Effect of the Limitation of Liability Clause

Stal-Laval and ASEA AB have argued that the limitation of liability clause in Mead's contract with ASEA Inc. sufficiently disclaims any tort liability that could be assessed against them as manufacturers. They claim the benefit of this limitation of liability clause even though the contract was ostensibly between Mead and ASEA Inc. *See Cyclops Corp. v. Home Insurance Co.*, 389 F.Supp. 476 (W.D.Pa.) *aff'd*, 523 F.2d 1050 (3d Cir. 1975) (applying Ohio law); *K & C Inc. v. Westinghouse Electric Corp.*, 437 Pa. 303, 263 A.2d 390 (1970).

■ Whether or not Stal-Laval and ASEA AB can claim the benefit of the limitation of liability clause need not be decided, because under Ohio law this particular clause would not disclaim their alleged tort liability. As the Sixth Circuit has held:

> Under Ohio law provisions that purport to limit negligence liability are strictly construed by the courts. Such provisions are not given effect unless the intent to provide indemnification for a party's own negligence is expressed in clear and unequivocal terms.

*Bahamas Agricultural Industries Ltd. v. Riley Stoker Corp.*, 526 F.2d 1174, 1179 (6th Cir. 1975) (*citing, Dingledy Lumber Co. v. Erie R. R.*, 102 Ohio St. 236, 131 N.E. 723 (1921)).

In *Bahamas Agricultural* the Sixth Circuit held the following clause was insufficient to relieve the defendant from liability for its own negligence:

> As our [Bailey Meter's] representatives are authorized to act only in a consulting capacity and are not authorized nor licensed to operate equipment, all responsibility for operation rests with the Purchaser. Bailey Meter Company shall not be liable for any claims, losses, labor, expenses or damages, direct or consequential, resulting directly or indirectly from the service performed, or for other consequential loss or damage of any nature arising from any cause. (A. E–12)

In the instant case, the limitation of liability clause, set out below, is even less clear than the one at issue in *Bahamas Agricultural*:

> "16. Our liability is in all cases limited as provided in these Conditions and does not extend to consequential damages, either direct or indirect, nor to expenses for repairs or replacements or otherwise, paid or incurred without our authority. We accept no liability for defects or depreciation caused by damage in transit, faulty erection, wear and tear, accidents, lightning, dampness, neglect, misuse or other abnormal conditions, due directly or indirectly to circumstances beyond our control."

■ Although the *Bahamas Agricultural* court's holding concerned only negligence liability, its holding can be applied to Mead's implied warranty in tort claims as well as its negligence claims. And since an intent to indemnify from tort liability is not expressed in "clear and unequivocal terms" in the limitation of liability clause relied upon by the defendants, the court holds that this limitation of liability clause does

---

For an able discussion of the questions raised by the present construction of Ohio's "saving clause" see Note, 37 Ohio St.L.J. 450 (1976).

*Cf. Wright v. Keiser*, 568 P.2d 1262 (Okl.1977) (Oklahoma saving clause declared unconstitutional).

not relieve Stal-Laval and ASEA AB of any alleged tort liability. *Bahamas Agricultural Industries Ltd. v. Riley Stoker Corp.*, 526 F.2d 1174, 1179 (6th Cir. 1975). *Accord, Berwind Corp. v. Litton Industries, Inc.*, 532 F.2d 1, 3–8 (7th Cir. 1976); *Jig the Third Corp. v. Puritan Marine Insurance Underwriters*, 519 F.2d 171, 178–79 (5th Cir. 1975).

### III. THE SUBSTANTIVE ISSUES

#### A. *Can purely economic losses be recovered under a strict liability in tort theory?* [11]

Essentially, a defective product can cause three types of damage: personal injury, property damage, and economic loss. Both personal injury and property damage involve direct physical injury. Personal injury, of course, results when a defective product causes injury to a person; and property damage results when a defective product causes injury to property. Economic loss, on the other hand, is the loss sustained by the one who possesses the defective product. Economic loss can be both "direct" and "indirect." "Direct economic loss" is the loss attributable to the decreased value of the product itself. It is measured by the difference between the actual value of the defective product and the value it would have had had it not been defective. "Indirect economic loss" is the consequential damage an owner of a defective product sustains. Most often these consequential damages are business losses an owner incurs when he is deprived of the product's use.[12]

In the instant case Mead seeks to recover both direct and indirect economic losses. Mead claims that its direct economic loss amounted to $250,000 (the amount required to put the # 12 turbine back in working condition) and that its indirect economic loss amounted to $1,510,000 (its business losses attributable to the outage of the # 12 turbine). The defendants claim, however, that economic losses cannot be recovered under a strict liability in tort theory.

The question whether economic losses can be recovered under a strict liability theory lies in the field of divided opinion. Essentially, two points of view prevail: those courts that allow recovery in tort for economic loss generally follow the line of reasoning set out in *Santor v. A & M Karagheusian, Inc.*, 44 N.J. 52, 207 A.2d 305, 2 UCC Rep.Serv. 599 (1965); and those courts that do not allow recovery in tort for economic loss generally follow the line of reasoning set out in *Seely v. White Motor Company*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145, 2 UCC Rep.Serv. 915 (1965).

In *Santor* the plaintiff had bought carpeting from a third party distributor. This carpeting had been manufactured by the defendant. When the carpeting proved to be defective the plaintiff brought suit against the defendant manufacturer. Despite the lack of privity between the plaintiff and the defendant, the New Jersey Supreme Court allowed the plaintiff to recover his direct economic loss under an implied warranty of merchantability theory and a strict liability theory. The *Santor* court held:

> There is no doubt that the great mass of warranty cases imposing liability on the manufacturer regardless of lack of privity were concerned with personal injuries to the ultimate consumer. . . .
> But we see no just cause for recognition

---

11. The Ohio Supreme Court has recently adopted the Restatement of Torts 2d's version of strict liability in tort for physical harm caused by a defective product. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 364 N.E.2d 267 (1977). The court indicated, however, that there are "virtually no distinctions between Ohio's 'implied warranty in tort' theory and the Restatement version of strict liability in tort . . . ." *Temple*, 50 Ohio St.2d at 322, 364 N.E.2d at 271.

12. For a general discussion of economic loss, as distinguished from personal injury and property damage see Note, *Recovery of Direct Economic Loss: the Unanswered Questions of Ohio Products Liability Law*, 27 Case W.Res.L. Rev. 683, 685–86 (1977); Note, *Products Liability Jurisprudence*, 66 Colum.L.Rev. 917, 918 (1966); Note, *Manufacturers Liability to Remote Purchasers for "Economic Loss" Damages—Tort or Contract*, 114 U.Pa.L.Rev. 539, 541 (1966).

of the existence of an implied warranty of merchantability and a right to recovery for breach thereof regardless of lack of privity of the claimant in the one case and the exclusion of recovery in the other simply because loss of value of the article sold is the only damage resulting from the breach.

.  .  .

[T]he strict liability in tort formulation of the nature of the manufacturer's burden to expected consumers of his product represents a sound solution to an ever-growing problem, and we accept it as applicable in this jurisdiction. And, although the doctrine has been applied principally in connection with personal injuries sustained by expected users from products which are dangerous when defective, we reiterate our agreement with *Randy Knitwear, Inc. v. American Cyanamid Company* [11 N.Y.2d 5, 226 N.Y.S.2d 363, 181 N.E.2d 399 (1962)], that the responsibility of the maker should be no different where damage to the article sold or to other property of the consumer is involved.

2 UCC Rep.Serv. at 603, 608, 207 A.2d at 308, 312.

In *Seely v. White Motor Company* the plaintiff purchased a truck manufactured by the defendant. Subsequently the truck overturned, due in part to defective brakes, and the plaintiff brought suit to recover both direct and indirect economic loss. The Supreme Court of California held the plaintiff could recover because an express warranty existed between the parties; however, the court went on to hold that a strict liability in tort theory, urged upon the court by the plaintiff, should never be used to allow recovery for purely economic loss. As Judge Traynor said in his opinion for the court:

The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the "luck" of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an under-standing of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by· defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will.

2 UCC Rep.Serv. at 921, 45 Cal.Rptr. at 23, 403 P.2d at 151.

Since the *Santor* and *Seely* decisions the courts in this country have divided almost evenly on the issue of the recovery of economic loss under strict liability in tort. *E. g., Cova v. Harley Davidson Motor Co.,* 26 Mich.App. 602, 182 N.W.2d 800 (1970); *Berg v. General Motors Corp.,* 87 Wash.2d 584, 555 P.2d 818 (1976); and *City of La Crosse v. Schubert, Schroeder & Associates, Inc.,* 72 Wisc.2d 38, 240 N.W.2d 124 (1976) have adopted the rationale of the *Santor* opinion. *E. g., Midland Forge, Inc. v. Letts Industries, Inc.,* 395 F.Supp. 506, 514–15 (N.D. Iowa 1975) (applied Iowa law); *Noel Transfer & Package Delivery Service Inc. v. General Motors Corp.,* 341 F.Supp. 968 (D.Minn. 1972) (applied Minnesota law); *Alfred N. Koplin & Co. Inc. v. Chrysler Corp.,* 49 Ill.App.3d 194, 7 Ill.Dec. 113, 364 N.E.2d 100 (1977; and *Hawkins Construction Co. v. Matthews Co., Inc.,* 190 Neb. 546, 209 N.W.2d 643 (1973), have adopted the rationale of the *Seely* opinion. *See also Morrow v. New Moon Homes, Inc.,* 548 P.2d 279 (Alaska 1976); *Nobility Homes of Texas, Inc. v. Shivers,* 539 S.W.2d 190, 20 UCC Rep. 15 (Tex.Civ.App.1976); *Thermal Supply of Texas v. Asel,* 468 S.W.2d 927, 9 UCC Rep. 393 (Tex.Civ.App.1971).

As indicated earlier, Ohio law governs this action. Therefore this court must examine the decisions of the Ohio courts to determine whether Mead can recover its economic losses under Ohio's strict liability in tort theory.

The Ohio Supreme Court first addressed this issue in *Inglis v. American Motors Corp.*, 3 Ohio St.2d 132, 209 N.E.2d 583 (1965). The plaintiff in *Inglis* had purchased a Rambler for $2,700. Immediately after delivery the plaintiff had numerous problems with the Rambler and was unable to get any satisfaction from his car dealer. He then sued the manufacturer to recover his direct economic loss on the purchase of the Rambler.[13] Relying heavily upon the *Santor* opinion, the supreme court held the plaintiff could recover. At the time, the Ohio Supreme Court had not yet enunciated its implied warranty in tort theory,[14] so the *Inglis* court fashioned an express warranty theory to hold the defendant liable. Despite its use of this warranty theory (which arguably is a contractual remedy), the *Inglis* court made it clear by its reliance on *Santor* that the express warranty theory employed sounded in tort and not in contract.

Five years after the *Inglis* decision the Ohio Supreme Court indirectly affirmed that economic losses could be recovered under a tort theory. In *United States Fidelity & Guaranty Co. v. Truck & Concrete Equipment Co.*, 21 Ohio St.2d 244, 257 N.E.2d 380 (1970), the plaintiff had insured a cement truck that had been manufactured by the defendant. When the cement mixer fell off the chassis of the truck the resulting damage to the truck was $7,000. As the insurer, the plaintiff paid $7,000 to the owner of the truck and then sued the manufacturer. The main issue before the supreme court was whether the statute of limitations of contracts or torts should apply. After determining that there was no contractual relationship between the parties, the supreme court characterized the plaintiff's action as one in tort "based upon the breach of an implied warranty . . . where injury to person or to property could be reasonably anticipated." *United States Fidelity*, 21 Ohio St.2d at 251, 257 N.E.2d at 384. By characterizing this action as one in tort, therefore, the Ohio Supreme Court again endorsed the recovery of direct economic loss[15] under a tort theory.[16]

Finally, in 1975 the Ohio Supreme Court issued an opinion that left no doubt about the recovery of economic loss in Ohio under a strict liability theory. In *Iacono v. Anderson Concrete Corp.*, 42 Ohio St.2d 88, 326 N.E.2d 267 (1975), the plaintiff sued a concrete manufacturer whose concrete was used to pour the plaintiff's driveway. The driveway was poured in the spring of 1969 and that winter "pop-outs" (small holes) began to form. The plaintiff sued both the manufacturer of the concrete and the paving contractor who poured the driveway. The only damages the plaintiff sought to recover were for the repair of the driveway. A jury awarded the plaintiff $13,000 (unapportioned between the manufacturer and the contractor), but on appeal the appellate court held that a tortious act had not been

---

**13.** The plaintiff claimed that because of its many defects his Rambler was worth only $1,200 at the time he purchased it. Since the purchase price was $2,700, the plaintiff claimed his direct economic loss was $1,500.

**14.** A year after *Inglis* the Ohio Supreme Court announced its version of strict liability in tort in *Lonzrick v. Republic Steel Corp.*, 6 Ohio St.2d 227, 218 N.E.2d 185 (1966). The *Inglis* opinion, as well as *Rogers v. Toni Home Permanent Co.*, 167 Ohio St. 244, 147 N.E.2d 612 (1958), is generally recognized as one of the forerunners of the *Lonzrick* opinion.

**15.** The $7,000 the plaintiff in *United States Fidelity* was trying to recover was clearly direct

economic loss. The diminution in value caused by the defectiveness of the truck was measured by the amount required to repair the truck. *See* Note, *Economic Loss in Products Liability Jurisprudence*, 66 Colum.L.Rev. 917, 918 (1966).

**16.** The Sixth Circuit has relied upon *United States Fidelity* to classify an action for economic loss as an action in tort. *Mahalsky v. Tool Co.*, 461 F.2d 581, 584 (6th Cir. 1972). *Mahalsky* was a statute of limitations case in which the Sixth Circuit did not reach the merits of the tort claim.

alleged against the manufacturer and reversed the jury's verdict as to the manufacturer only.

The question before the Ohio Supreme Court was whether the plaintiff's complaint plead "a cause of action in tort upon an implied warranty theory." *Iacono*, 42 Ohio St.2d at 89, 326 N.E.2d at 268. The supreme court relied upon the *Inglis* decision and again set out the portion of the *Santor v. A & M Karagheusian* opinion that had been set out in *Inglis*:

> From the standpoint of principle we perceive no sound reason why the implication of reasonable fitness should be attached to the transaction and be actionable against the manufacturer where the defectively made product has caused personal injury and not actionable when inadequate manufacture has put a worthless article in the hands of an innocent purchaser who has paid the required price for it.

*Iacono*, 42 Ohio St.2d at 93, 326 N.E.2d at 270–71 (*citing Santor v. A & M Karagheusian*, 44 N.J. 52, 60, 207 A.2d 305, 309 (1964)). The supreme court then concluded:

> In view of all the foregoing, we hold that an action in tort, based on the properly pleaded theory of breach of implied warranty, may be maintained to recover for damage to property.

*Iacono*, 42 Ohio St.2d at 93, 326 N.E.2d at 271.

██ While the Ohio Supreme Court labeled the recovery in *Iacono* to be for "property damage," the plaintiff in *Iacono* was really compensated for his direct economic loss. Just like the plaintiff in *Inglis*, the plaintiff in *Iacono* sought to recover the difference between the value of what he had paid for and the value of what he had

received. This is clearly a recovery of direct economic loss. Therefore, after *Iacono*, it is clear that Ohio law allows recovery of economic loss under a strict liability theory.[17]

Supportive of this court's interpretation of Ohio law are two recent decisions by United States district courts. In *Continental Oil Co. v. General American Transportation Corp.*, 409 F.Supp. 288 (S.D.Tex.1976) the court was required to apply Ohio law to a suit involving 46 defective railroad cars. The Texas district court reviewed the *Iacono* decision and held that under Ohio law direct economic loss could be recovered under a strict liability theory. *Continental Oil*, 409 F.Supp. at 296–97. Likewise in *Adcor Realty Corp. v. Mellon-Stuart Co.*, 450 F.Supp. 769 (N.D.Ohio 1978), the court applied Ohio law and held that the *Iacono* decision permitted a strict liability in tort action for the recovery of direct economic loss. *Adcor Realty*, 450 F.Supp. at 770 & n. 1.

██ This court therefore holds that under Ohio law the plaintiff can bring an action under strict liability in tort for the recovery of economic loss. And while the court recognizes that the cases discussed above all involved the recovery of *direct* economic loss only, this court can see no logic to limiting a claimant's recovery to direct economic loss when indirect economic loss has also been suffered. See *Avenell v. Westinghouse Electric Corp.*, 41 Ohio App.2d 150, 159, 324 N.E.2d 583, 589 n. 8 (1974). Accordingly, the court holds that the plaintiff has stated a claim for the recovery of direct and indirect economic loss under the theory of strict liability in tort.[18]

---

17. In their brief the defendants placed great reliance upon *Avenell v. Westinghouse Electric Corporation*, 41 Ohio App.2d 150, 324 N.E.2d 583 (1974). In *Avenell* the Ohio Court of Appeals held that the doctrine of implied warranty in tort was not available to a plaintiff who attempted to recover consequential damages from the seller of an allegedly defective generator. But the *Avenell* decision rests upon a tenuous, and unarticulated, distinguishment of an earlier Ohio case law, *Avenell*, 41 Ohio

App.2d at 158 n. 7, 324 N.E.2d at 588 n. 7, and, more importantly, it pre-dates the Ohio Supreme Court's clear statement on the recovery of economic loss in *Iacono v. Anderson Concrete Corp.*, 42 Ohio St.2d 88, 326 N.E.2d 267 (1975). This court, therefore, does not consider *Avenell* to be good authority.

18. This holding does not, of course, mark the end of the road for the defendants. The plaintiff still has the considerable task ahead of proving his claim that the defendants' manu-

B. *Can purely economic losses be recovered under a negligence theory?*

In *Inglis v. American Motors Corp.*, 3 Ohio St.2d 132, 209 N.E.2d 583 (1965) the Ohio Supreme Court upheld the court of appeals' disallowance of a claim for economic loss that was based upon negligence. *Inglis*, 3 Ohio St.2d at 140–41, 209 N.E.2d at 588. This holding by the *Inglis* court still controls and it remains the law in Ohio that economic loss cannot be recovered under a negligence theory in product liability actions. *But see, Continental Oil Co. v. General Transportation Corp.*, 409 F.Supp. 288, 296–97 (S.D.Tex.1976) (incorrectly construing *Iacono* to have allowed recovery in negligence).

## CONCLUSION

In accordance with the reasoning set out above, the court hereby denies the defendants' motions for summary judgment on the plaintiff's strict liability in tort claim and grants the defendants' motions for summary judgment on the plaintiff's negligence claim.

IT IS SO ORDERED.

factured a "defective product" that caused injury to the plaintiff. *See Temple v. Wean Unit-* ed, Inc., 50 Ohio St.2d 317, 364 N.E.2d 267 (1977).