JATCO, INC., Plaintiff,

v.

CHARTER AIR CENTER, INC.,
Defendant.

No. C–1–79–412.

United States District Court,
S. D. Ohio, W. D.

Dec. 10, 1981.

Charles G. Atkins, Cincinnati, Ohio, for plaintiff.

John A. Goldberg, Cincinnati, Ohio, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND JUDGMENT

SPIEGEL, District Judge:

This case came before the Court on November 2, 1981, and continued until November 9, 1981, when both parties rested. The Court, having heard all of the testimony during the trial, examined all documents submitted into evidence, and considered the briefs and arguments of counsel, now makes the following Findings of Fact and Conclusions of Law as set forth in the body of this Opinion, consistent with Rule 52(a), Fed.R.Civ.P.

## FINDINGS OF FACT

Plaintiff, Jatco, Inc., (Jatco) was at all times relevant to this action a corporation organized and existing under the laws of the State of Ohio with its principal place of business located in Cincinnati, Ohio.

Defendant, Charter Air Center, Inc., (Charter) was at all times relevant to this action a corporation organized and existing under the laws of the State of Florida with its principal place of business located in Gainesville, Florida. Charter did not main-tain a business office in Ohio, did not have or retain an agent, servant or employee to do business in Ohio, and was not licensed to do business as a foreign corporation in Ohio.

Jatco owned a Lockheed Electra airplane, Serial Number 1085, Registration Mark N–124US. Jatco filed this lawsuit on July 19, 1979, charging Charter with breach of a contract to purchase this airplane by failure to make payment for the airplane according to the terms of a contract between the parties. The matter in controversy exceeds the sum of $10,000, exclusive of interests and costs, and this Court has jurisdiction pursuant to 28 U.S.C. § 1332(a).

Negotiations between the parties started in late January or early February 1974. At that time, Jatco was a leasing corporation which had been formed for the purpose of leasing aircraft to Vagabond, a non-profit air travel club. Jatco had purchased the airplane in question, N–124US, in June 1972 and was operating it under an FAR 123 certificate issued by the Federal Aviation Administration (FAA). Mr. Thomas Moore was the president of Vagabond and an officer of Jatco at the time in question. His duties were primarily concerned with financing and marketing. He became involved with those organizations in October 1971. He hired a director of operations and a director of maintenance to ensure that Vagabond's responsibility to maintain the airplane under their FAR 123 certificate was complied with, as he had no personal knowledge of this aspect of Jatco's or Vagabond's operations. The airplane, N–124US was serviced by Overseas National Airlines (ONA) and Equitoriana Service Company while Jatco owned and Vagabond leased it.

In late January 1974, Mr. L. T. "Red" Kitchens called Mr. Moore. Mr. Kitchens was an FAA licensed airframe and powerplant (A & P) mechanic who serviced Electras and had worked on N–124US while he was employed by ONA during 1973. Mr. Kitchens told Mr. Moore that he was going to work for Charter, and that Charter was interested in acquiring Vagabond's Lockheed Electra N–124US. About that time,

or early in February of 1974, Mr. Moore also spoke to Mr. William Cousins, president of Charter, about Charter's possible purchase of the airplane.

Charter was in the business of aircraft maintenance, sales, and service. Mr. Cousins himself was a licensed A & P mechanic, and he employed approximately 20 licensed inspectors and mechanics at Charter. He told Mr. Moore that he was interested in purchasing N–124US to transport the University of Florida's athletic teams and/or for leasing the airplane for other charter group flights. Mr. Moore, on the other hand, wanted to sell the Electra in order to be able to acquire a Boeing jet which he felt would be a more viable plane for the air travel club's needs.

The aircraft, N–124US, was purchased by American Flyers Corporation in September 1966 from Northwest Airlines, Inc., for $1,200,000. Charter's president, Mr. Cousins, had been employed as a flight engineer by American Flyers from September 1966 to May 1971, as was his chief inspector at Charter, Mr. George Suddath. Mr. Cousins was familiar with N–124US from working on it while he was at American Flyers. In May 1971, American Flyers sold the plane to Falair, Inc., who immediately sold it to International Air Lease. International Air Lease sold the plane to Jatco in June 1972. This was the first plane which Jatco had purchased.

When Mr. Moore and Mr. Cousins discussed the possible sale and purchase of the airplane, Mr. Moore described the configuration of the airplane (passenger and crew seating capacity, galley locations, lavatory and over-water equipment), which he stated was in above average condition in appearance, and told Mr. Cousins what they had been using the plane for and approximately how many hours per year it had been flown. He also told him where the plane had been serviced, and that it was operating under an Airworthiness Certificate issued under FAR 123. At no time did Mr. Cousins rely on any statement by Mr. Moore or the plane's pilot, Harvey Sturdevant, concerning the plane's airworthiness condition.

Pursuant to these discussions, the parties arranged for the Electra to be flown to Charter's facilities in Gainesville, Florida, so that Charter could inspect it. The plane was delivered to Charter sometime between February 14 and 17, 1974 for this purpose. When the aircraft was delivered, it was operating under an FAA certificate of airworthiness. Mr. Cousins was aware that N–124US was due for a regularly scheduled "heavy inspection" in March 1974, and that several of its engines were near or had exceeded "run out" time.

Mr. Cousins assigned three or four Lockheed Electra mechanics to go over the plane. Mr. George Suddath, an FAA licensed A & P mechanic who had worked up to be an inspector, was Charter's chief inspector and an expert on Lockheed Electras. He had had control over all the inspections on N–124US while it had been owned by American Flyers. When N–124US was flown in, he was instructed to give the plane a prepurchase inspection. The plane was flown in with the right wing stripped of paint. The airplane's logs were with it, and Charter had previously been furnished with a specifications sheet by Jatco.

Work orders reflected that the center dry bay section of the right wing was opened for inspection and closed and that the right-hand fillets (fairings) were removed for corrosion inspection prior to February 20, 1974. When the righthand wing fillets were removed, it could be observed that an area of the wing had been covered with a reddish-brown sealant which had bubbled, and Mr. Suddath observed this himself. Another work order reflected that the right wing had been inspected for corrosion to determine the type of repair required, that the center section was opened to determine the type of repair required for corrosion, and that the dry bay area was closed prior to February 24. Mr. Suddath stated that his initial external inspection of the plane indicated, because of the external corrosion present, that there was probably interior corrosion which would require an indepth

inspection. He had the impression, based on the condition of the plane, that he would find stress crack corrosion.

The "serious and substantial defect in the wing" which formed the basis for defendant's contentions that they had not breached the contract, consisted of a corrosion crack, approximately six inches in length, in wing plank number one, at butt line 65 in the upper surface of the right wing just aft of the main frame forging. The crack was covered with a sealant known as PRC, which was reddish-brown in color. The use of PRC in the area of the crack is permissible as a moisture barrier to prevent the recurrence of previously treated corrosion. If PRC is found in the area of a plane in which the crack was located, it is indicative of a previous corrosion repair. The PRC sealant covering the crack was visible upon removal of the right wing fillet, and there was a bulge under the sealant, approximately four inches long and one-half inch high which was readily apparent upon visual inspection. The presence of such a bulge under the sealant indicated the presence of corrosion and the sealant covering the crack could be and was quickly and easily removed by hand.

Even after Charter had had an opportunity to inspect the airplane, including the right wing, Mr. Moore and Mr. Cousins continued their negotiations over the telephone. Mr. Moore outlined the initial terms of the agreement which the parties had discussed in a letter to Mr. Cousins dated February 22, 1974, written for Mr. Cousins' signature. Mr. Cousins did not sign that letter, but, pursuant to another telephone conversation with Mr. Moore, drafted another letter which altered some of the initial terms proposed by Mr. Moore, including lowering the amount of the initial payment to be made by Charter and adding the term that if Vagabond were to use the plane for any additional flights, the purchase price would be subject to a complete reinspection of the aircraft at their conclusion. Mr. Cousins signed this letter, dated February 28, 1974, and mailed it to Cincinnati, where it was received by Mr. Moore on March 4, 1974. The letter was accompanied by a check drawn on Charter's account with a Gainesville, Florida bank post-dated to March 7, 1974, in the amount of $10,000. Mr. Moore signed the letter, returned it to Cousins, and retained a copy for himself.

Under the terms of the letter, the purchase price of the airplane was $317,000. Jatco agreed to accept an initial payment of $10,000 to be applied to the purchase price on the terms and conditions of the letter. Charter agreed to pay the balance of $307,000 upon receipt of evidence of clear title and appropriate transfer of registration documents within 90 days, or any other arrangement agreed to by the parties. Charter stated that it had had "ample opportunity for inspection" of N–124US.

Mr. Moore deposited Charter's check for $10,000 with the Provident Bank in Cincinnati on March 4, 1974. Provident held the only liens in existence on the airplane. On March 6, Mr. Peter Knapp, Vice President of Provident, wrote Mr. Cousins a letter informing him that upon receipt of the balance of the purchase price the bank would forward to him a properly executed aircraft bill of sale and an executed form releasing all liens held by the bank on the airplane.

The parties met in Cincinnati on March 9, 1974, to discuss the financing arrangements for the airplane. Mr. Moore, Mr. Cousins, Mr. Ray Bernardi, who was introduced as Mr. Cousins' agent for purposes of financing, and Mr. Kitchens were present. Mr. Moore suggested that Charter pay $20,000 by March 15, and an additional $20,000 the following week so that he would have funds available to purchase a Boeing 720 for the club. Mr. Cousins indicated that that would be no problem. Another meeting was scheduled to be held in the near future with the financial backer of Charter and the Bank which was to be financing the aircraft. Jatco made available to Charter all maintenance records which they requested, specifically those having to do with the engines, and offered them access to any other records they might want, although Charter did not request any more.

On March 11, Mr. Bernardi called Mr. Moore and suggested for the first time that Charter was encountering difficulties with the financing of the airplane. Later that day, Mr. Bernardi called again to inform Mr. Moore that Mr. Cousins had stopped payment on the $10,000. The next day, Mr. Cousins told Mr. Moore that he stopped payment only to avoid a temporary overdraft situation, and he needed just a few more days in order to be able to cover it. Mr. Cousins and Mr. Bernardi both told Mr. Moore that they still intended to purchase the aircraft and were pursuing other sources of financing.

On March 26, Mr. Bernardi told Mr. Moore that Charter still had financing difficulties, and that the problem seemed to be that the airplane was overpriced. He proposed that Jatco finance Charter's purchase of the airplane. Mr. Moore looked into the possibility and called Mr. Bernardi that same day to tell him the terms under which Jatco would finance the purchase for Charter. Charter never accepted these terms.

On March 29, 1974, the FAA performed a "ramp check" or spot inspection on N–124US in Gainesville, Florida. In a letter dated April 10, 1974, they reported to Mr. Moore regarding maintenance items found, which included corrosion in the entire right wing fillet area indicating interior corrosion in the center section dry bay area which had not been accessible for inspection. On April 11, 1974, the FAA issued an airworthiness directive applicable to all airplanes, including N–124US, which carried a certain type of propeller. The directive required that the propeller blades and hubs be stripped of all plating, inspected for corrosion, and replated within a certain time frame. This procedure was a major operation which would cost approximately $80,000.

Then, on April 23, 1974, Mr. Cousins and Mr. Kitchens called Mr. Moore and told him that the aircraft had a serious crack in the main wing frame forging on the right wing and a crack through the number one wing plank in the center section which had been covered with a sealant called PRC. The cracks were in the area inspected by Mr. Suddath prior to February 24, and the sealant had been observed by him at that time. Testimony from two FAA licensed A & P mechanics who qualified as experts, LaVoyd Crowe and Samuel Prysiazniuk, indicated that if they had observed the PRC during an inspection of the airplane, they would have immediately removed it for further inspection.

This crack required approximately 500 man hours and an estimated cost of $10,000 to repair. It was not necessary to remove the wing from the plane to effectuate the repair, but the repair was necessary to return the plane to a condition of airworthiness. Although cracks of the nature of the one found on N–124US were not common at the time the one in question occurred, it was widely known that the right wing area of Lockheed Electras were susceptible to corrosion because of the location of the bathroom holding tanks.

Charter never made its $10,000 check good and never tendered any other payment to Jatco pursuant to the contract. In August 1974, Jatco sold the airplane to Jet Research, Inc., for $195,000. The plane was flown to Jet Research's facilities in California under a restricted ferry flight permit under which no passengers were allowed, and restrictions were placed on the speed and the weight of the aircraft. Repairs to the plane were made in California, and the plane was converted to a cargo plane and used for that purpose until recently when it burned in a hangar fire.

## CONCLUSIONS OF LAW

This action concerns a contract for the sale of goods; thus, substantive matters of law in this case are controlled by the Uniform Commercial Code Articles 1 and 2, as adopted by both Ohio and Florida. Ohio Rev.Code Chapters 1301 and 1302; Fla.Stat. Ann. § 671.1–101 *et seq.* No discernible difference in the law of sales as it relates to this transaction exists between the two states.

Mr. Cousins' letter to Mr. Moore dated February 28 and countersigned by Mr.

Moore on March 4 constituted a valid and binding contract between the parties. The contract was for the sale and purchase of N–124US, after ample opportunity to inspect the plane by Charter, for a total purchase price of $317,000. Charter was to make an initial payment of $10,000, the balance due after Jatco furnished evidence of clear title, but no later than 90 days from the date of the contract or any other arrangement agreed to by both parties. Thus, the only term left open was how Charter would pay the balance of the purchase price.

■ Charter encountered financial difficulties and was simply unable to obtain financing for the price of the plane. Despite repeated efforts by Mr. Moore to help Charter obtain the necessary financing, including his offer that Jatco would finance the purchase, Charter never found financing under terms that it could meet, and thus was unable to pay the purchase price. Charter breached the contract when it failed to pay the purchase price of $317,000 within a reasonable time, or 90 days, to the Provident Bank in Cincinnati subsequent to Jatco furnishing Charter with evidence of clear title and otherwise performing all of its obligations under the contract. Under the language of the contract, payment of the balance of the purchase price should have been made on or before May 28, 1974.

■ Charter's performance was not excused due to breach of express or implied warranty by Jatco. No express warranty by Jatco to Charter with respect to the aircraft can be created unless Jatco made an affirmation of fact or promise to Charter which related to the aircraft and which formed part of the basis of the bargain, or a description of the aircraft by Jatco was made part of the basis of the bargain. Ohio Rev.Code § 1302.26(A)(1) and (2); UCC 2–313(1)(a) and (b). No affirmation of fact was made by Jatco to Charter which was untrue. The description by Mr. Moore of the configuration of the plane as above average was not disputed. When the plane was flown to Charter it was operating under a valid FAR 123 certificate of airworthiness. There was no evidence that the plane was not maintained pursuant to FAA regulations. Further, the conduct of the parties indicates that no express warranty was intended to be a part of the basis of the bargaining period. Jatco had no expertise in the operation and maintenance of aircraft, and Charter's was considerable. Thus, the contract was premised upon Charter having ample opportunity to inspect the airplane, which it had and did. At the time Charter entered into the contract, it knew or should have known of the cracks in the plane's right wing and main frame forging which it later claimed constituted a breach of warranty.

■ No warranty that the aircraft was merchantable could be implied, unless Jatco were a merchant with respect to goods of that kind. Ohio Rev.Code § 1302.27(A); UCC 2–314(1). A "merchant" means one who deals in goods of that kind or otherwise holds himself out as having knowledge or skill peculiar to the goods involved. Ohio Rev.Code § 1302.01(A)(5); UCC 2–104(1). A person making an isolated sale of goods is not a "merchant" within the meaning of the statutory section creating an implied warranty of merchantability. Ohio Rev.Code § 1302.27(A) Comment 3. Since Jatco made only an isolated sale of one aircraft, it did not deal in aircraft, and did not hold itself out as having knowledge or skill peculiar to the goods involved, Jatco is not a "merchant" within the meaning of Ohio Rev. Code § 1302.27(A) and no implied warranty of merchantability can arise.

No warranty of fitness for a particular purpose can be implied unless the buyer is relying on the seller's skill and judgment to select or furnish suitable goods for a particular purpose for which the seller knows the goods are required. Ohio Rev.Code § 1302.-28; UCC 2–315. Although Jatco knew the purposes for which Charter required the airplane, Charter did not rely on Jatco's skill and judgment in furnishing it with an airplane for this purpose. Charter had expertise in this area where Jatco had none. Charter had sufficient opportunity to inspect the plane to determine if it would be

suitable for its intended purposes. Charter determined that it was, and so stated in the terms of the contract between the parties. There being no reliance by Charter on Jatco's skill or judgment as to the condition of the aircraft, no implied warranty for fitness for a particular purpose arose.

Charter also alleged fraud and failure of consideration resulting from mutual mistake as legal excuses for non-performance of its obligation to pay the purchase price for the airplane under the contract. The Court found no evidence to support either of these theories. Insofar as fraud is concerned, Jatco made no material misstatement of fact upon which Charter relied to its detriment regarding the airplane's condition, and it did nothing to conceal the defect of which Charter complained. Nor was the wing crack of sufficient magnitude to constitute a failure of consideration. It was simply a matter of repair which necessitated the plane being grounded until it was completed, which is not an infrequent occurrence with airplanes. In this case, the total cost of the repair was only approximately three percent of the total purchase price of the airplane.

From the evidence presented, Charter knew of or should have known of the crack prior to the time it entered into the contract. Charter's financing difficulties, coupled with the FAA airworthiness directive which came out in April requiring maintenance costs of approximately $80,000 in connection with the airplane, formed the basis for Charter's failure to perform under the contract. The wing crack simply provided a pretext for Charter to attempt to avoid its obligation to pay the purchase price.

■ Acceptance of goods occurs when the buyer, after a reasonable opportunity to inspect the goods, signifies to the seller that he will accept them or fails to make an effective rejection of the goods by notifying the seller of the rejection within a reasonable amount of time. Ohio Rev.Code § 1302.64 (UCC 2–606); Ohio Rev.Code § 1302.61 (UCC 2–602). Charter's actions in entering into the contract to purchase the airplane which it had previously inspected

and which was in its possession and in continuing to negotiate with Jatco regarding the method by which payment for the plane was to be made after it had had reasonable time within which to discover any defects constituted an acceptance of the airplane. Charter's subsequent rejection of the aircraft was wrongful, as not within a reasonable time, and Jatco's rights with respect to the airplane are governed by Ohio Rev.Code § 1302.77. Ohio Rev.Code § 1302.61 (UCC 2–602). Acceptance of goods precludes their subsequent rejection. Ohio Rev.Code § 1302.65(B) (UCC 2–607). The buyer must pay at the contract rate for any goods accepted. Ohio Rev.Code § 1302.65(A).

Where the buyer wrongfully rejects or revokes acceptance of goods, the aggrieved seller may resell the affected goods and recover damages from the buyer as provided in § 1302.80 of the Ohio Rev.Code. Ohio Rev.Code § 1302.77(D). Where an aggrieved seller resells the goods in good faith and in a commercially reasonable manner, the seller may recover the difference between the resale price and the contract price. Ohio Rev.Code § 1302.80(A); UCC 2–706(1). Since Jatco sold the airplane in good faith and in a commercially reasonable manner for $195,000, Jatco is entitled to recover $122,000 from Charter plus interest at the rate of eight percent per annum from August 6, 1974.

Charter has raised one other defense in this action which is that the action was barred by the applicable statute of limitations. The Court finds Charter's various arguments regarding this defense to be without merit for the following reasons:

■ In a diversity action in the United States District Courts of Ohio, the procedural law of Ohio must be applied to determine the appropriate statute of limitations. *Klaxon Co. v. Stentor Electrical Manufacturing Company*, 313 U.S. 487, 61 S.Ct. 1020, 45 L.Ed. 1477 (1941); *Mahalsky v. Salem Tool Company*, 461 F.2d 581 (6th Cir. 1972). Since this action arises from a breach of contract for the sale of goods, the applicable statute of limitations is found in Ohio Rev.Code § 1302.98 which provides at

subsection (A) that such an action must be commenced within four years. However, § 1302.98(D) also provides that it does not alter the provisions of Ohio Rev.Code § 2305.15.

Ohio Rev.Code § 2305.15 provides that: When a cause of action accrues against a person if he is out-of-state, or has absconded or conceals himself, the period of limitations for the commencement of the action ... does not begin to run until he comes into the state or while he is so absconded or concealed.

This statute has been interpreted as tolling the running of the applicable statute of limitations so long as an individual or a corporation is not amenable to personal service within the State of Ohio, regardless of whether the individual or entity sought to be served is subject to service of process under Ohio's long-arm statute. *Seeley v. Expert, Inc.*, 26 Ohio St.2d 61, 269 N.E.2d 121 (1971); *Scheer v. Air Shields, Inc.*, 61 Ohio App.2d 205, 401 N.E.2d 478 (1979); *Mead Corp. v. Allendale Mutual Insurance Company*, 465 F.Supp. 355 (N.D.Ohio 1979); *Ohio Brass Company v. Allied Products Corp.*, 339 F.Supp. 417 (N.D.Ohio 1972). However, this "tolling" statute has been held not to apply to causes of action which originate in foreign jurisdictions. *Ohio Brass Company v. Allied Products Corp.*, 339 F.Supp. at 420 *citing Wentz v. Richardson*, 165 Ohio St. 558, 138 N.E.2d 675 (1956); *Lantsberry v. Tilly Lamp Company*, 27 Ohio St.2d 303, 272 N.E.2d 127 (1971).

Since, under Ohio Rev.Code § 1302.98(B), a cause of action accrues when the breach of contract occurs, Jatco will be barred by the four-year statute of limitations unless Ohio's tolling statute is applicable to its cause of action. This raises the issue of whether Charter's breach of the contract occurred in Florida or in Ohio.

■ As previously discussed, Charter breached the contract by its failure to tender payment for the airplane as contemplated by the parties within 90 days of the execution of the contract. The general rule as to commercial transactions is that the place of performance is also the place of breach. 16 Ohio Jur.3d Conflict of Laws § 15. Ohio Rev.Code § 1302.23 (UCC 2–310) specifically states that absent an agreement to the contrary, place of delivery in a sale of goods transaction is the designated place of payment.

■ Charter argues that the breach occurred in Florida because the place of delivery in the transaction under consideration was Gainesville, Florida; there was no specification for place of payment in the contract between the parties; and the only payment tendered, the $10,000 initial payment, was dishonored at Charter's bank in Gainesville, Florida. However, the Court finds that the contract stated that payment was due upon Jatco furnishing Charter with evidence of clear title no later than 90 days from the date of the letter embodying the contract, "or any other arrangements agreed to by both parties." The evidence before the Court indicated that at the time of executing the contract, the parties contemplated that any arrangements would be concluded well within the 90 day time period. The title to the airplane was held by the Provident Bank in Cincinnati. Charter was informed by the Bank at Jatco's request that clear title with a release of all liens would be forwarded to Charter upon receipt by the Bank of the balance of the purchase price in Jatco's account. The course of dealings between the parties from that time on indicated that Charter would comply with the Bank's instructions as soon as it obtained the financial backing to do so. Charter never objected to this method of payment on any grounds other than its inability to perform. Thus, the dealings between the parties establishes that payment was to be made at Jatco's bank in Cincinnati, Ohio.

■ Performance of Charter's obligation was to be accomplished here in order for it to acquire title to the airplane. Thus, when payment was not made in Cincinnati, the breach of the contract occurred in Cincinnati, and Ohio's tolling statute applies to prevent the four-year statute of limitations from running against Jatco.

Charter next argues that if the Court finds that the tolling statute is applicable, plaintiff's claim must still be barred by the application of the four-year statute of limitations, because the tolling statute, Ohio Rev.Code § 2305.15 is unconstitutional both on its face and as applied to the facts of this action.

Charter's argument is based on the premise that the tolling statute violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Charter argues that there is no rational basis to distinguish between corporations which are licensed to do business or are doing business in Ohio, and thus are amenable to personal service, and corporations not doing business here and not amenable to personal service, but which are amenable to certified mail service under Ohio's long-arm statute, since the Ohio Supreme Court has stated that certified mail is the "basic and preferred method of service" on both types of corporations. Rule 4.1 Ohio Rules of Civil Procedure. Charter, relying on *Wright & Keiser*, 568 P.2d 1262 (Okla.1977), asserts that where a foreign corporation is subject to service which is the equivalent of personal service and which will subject it to the personal jurisdiction of our courts on the same basis as a resident corporation, no legitimate interest of the state is furthered by denying them the defense of Ohio's statute of limitations and placing them at a disadvantage vis-a-vis residents.

However, this Court finds that rationale of the Court in *Vostack v. Axt*, 510 F.Supp. 217 (S.D.Ohio 1981) to be persuasive. That Court also dealt with a challenge to the constitutionality of Ohio's "tolling" statute, Ohio Rev.Code § 2305.15, on equal protection grounds. The Court upheld the constitutionality of the statute, stating:

> The Court sees the savings clause rationally serving the legitimate state purpose of easing the possible burdens on plaintiffs in suits against out-of-state defendants. Since service of process under the long-arm statute is more difficult and time consuming to achieve than service

within the state, and since out-of-state defendants may be difficult to locate let alone serve, tolling the statute of limitations protects Ohio plaintiffs and facilitates their law suits against such defendants. The Court therefore concludes that it is not irrational for the Ohio Legislature to distinguish between in-state and out-of-state defendants. 510 F.Supp. at 223.

*See* further, *Hopkins v. Kelsey-Hayes, Inc.*, 628 F.2d 801 (3d Cir. 1980), *cert. granted, G. D. Searle & Company v. Cohn*, 451 U.S. 905, 101 S.Ct. 1972, 68 L.Ed.2d 293 (1981) (upholding a similar New Jersey tolling statute and *Vaughn v. Deitz*, 430 S.W.2d 487 (Texas 1968).

Accordingly, this Court finds that Ohio Rev.Code § 2305.15 does not violate the equal protection clause of the United States Constitution and will operate to toll the running of § 1302.98 against plaintiff's cause of action.

Accordingly, plaintiff having prevailed on the merits, it is hereby ordered that judgment be entered for the plaintiff in the amount of $122,000, plus interest at the rate of eight percent per annum from August 6, 1974.

SO ORDERED.